**EXXON CORPORATION, et al., Appellants,**

v.

**Laurie T. MIESCH, et al., Appellees.**

**No. 13–00–104–CV.**

Court of Appeals of Texas, Corpus Christi–Edinburg.

Nov. 29, 2005.

See also —— S.W.3d ——, 2005 WL 167051

Byron C. Keeling, Holman & Keeling, Jack O'Neill, Clements, O'Neill, Pierce, Nickens & Wilson, Jack Balagia, Jr., Houston, David Philip Wilson, John Andrew Cowan, Darren Lee Brown, Beaumont, Patton G. Lochridge, Karen L. Watkins, W. Timothy George, McGinnis, Lochridge & Kilgore, Austin, for appellants.

Michael James Krueger, Kingsville, William J. Joseph, Candace Beth Kaiser Eindorf, Fibich, Hampton & Garth, Hartley Hampton, Fibich, Hampton, Leebron & Garth, Maria Teresa Arguindegui, Law Office of Maria Teresa Arguindegui, William Hardy Young, Gallagher, Young, Lewis Hampton & Downey, Alice Oliver–Parrott, Burrow & Parrott, LLP, Eileen O'Neill, Ware Jackson Lee Chambers, Houston, David Philip Wilson, Beaumont, for appellees.

Before Chief Justice VALDEZ and Justices HINOJOSA and CASTILLO.

## OPINION

Opinion by Chief Justice VALDEZ.

This appeal follows a jury trial in an oil and gas case. Emerald Oil & Gas, L.C. ("Emerald"), a subsequent lessee, and intervening royalty interest owners[1] brought suit against Exxon Corp. and Exxon Texas, Inc., as successor in interest to Humble Oil & Refining Co. ("Exxon"), for wrongful conduct in the development and abandonment of oil and gas wells in the Mary Ellen O'Connor Field, near Refugio, Texas. The trial court granted Exxon's motion for directed verdict and en-

---

1. The royalty interest owners are Laurie T. Miesch, Molly Miesch Allen, Michael Miesch, Jack Miesch, Janie Miesch Robertson, Morgan Frances Dunn O'Connor, Brien O'Connor Dunn, Kelly Patricia Dunn Schaar, Bridey Kathleen Dunn Greeson, T. Michael O'Connor and Nancy O'Connor.

tered a take-nothing judgment against Emerald.[2] The jury found in favor of the royalty interest owners on their causes of action against Exxon for waste and breach of contract and awarded the intervenors both actual and punitive damages. The trial court entered judgment in accordance with the verdict. All parties have appealed. The judgment is affirmed in part and reversed in part.

## I. Background

Exxon leased the mineral interests on several thousand acres, the Mary Ellen O'Connor Field, near Refugio, Texas. Exxon's interest in the property spanned four decades beginning in the 1950's and was derived from four separate leases.[3] The leases are atypical of many oil and gas leases in some respects. They include, for instance, an unusually high fifty percent royalty obligation and stringent surrender clauses.

Beginning in the early 1970s, Exxon attempted to negotiate a reduction in its fifty percent royalty obligation on the field. Exxon owned an interest in a contiguous tract operated by Quintana, and its royalty obligation on that tract was substantially lower and thus more favorable for Exxon. Exxon told the royalty interest owners that the Mary Ellen O'Connor Field was no longer economical to operate, although Exxon continued production on the adjacent tract operated by Quintana.

In considering Exxon's request for a reduction in royalty interest, the royalty owners requested that Exxon provide them information and documentation regarding the productivity of the field. Under the terms of the leases, the lessors were entitled to "full information" covering all operations, including logs, reports, analyses, data, and information concerning oil and gas potentialities for the field.

Exxon initially refused to provide the royalty interest owners information on grounds that it was proprietary, then that the information would be too difficult to locate and retrieve, and finally, that the information would be made available only if a confidentiality agreement were signed. Nevertheless, Exxon ultimately provided the royalty interest owners a "reading room" containing documentation on the field. The reading room, however, did not contain all information on the field: Exxon did not include any interpretive data and did not include all of the well logs for the field. Some data on the field was not produced until discovery in the instant lawsuit, and some data, including calculations made by Exxon employee Joel Wylie regarding the productivity of the field and some of the well logs, was missing even at the time of trial.

The royalty interest owners suggested several options in renegotiating the terms of the lease. One of the options was a lower royalty obligation that would increase if productivity on the field increased. Exxon refused. After the failure of additional negotiations, the royalty interest owners began looking for a new lessee for the field. Exxon initially refused to allow another operator to take

---

2. Prior to trial, the trial court granted Exxon's motion for summary judgment on Emerald's statutory causes of action and severed the summary judgment. Emerald appealed the summary judgment. This Court reversed the trial court's judgment and remanded the case to the trial court for further proceedings consistent with the Court's opinion. *See Emerald Oil and Gas, L.C. v. Exxon Corp.,* ——

S.W.3d ——, ——, 2005 WL 167051 at *5, No. 13–99–757–CV, 2005 Tex.App. LEXIS 591, *16 (Tex.App.-Corpus Christi Jan. 27, 2005, pet. filed).

3. The leases are substantially similar. Any relevant distinctions between the leases will be discussed herein as necessary.

over the lease without a release. All negotiations ultimately proved unsuccessful. Accordingly, Exxon plugged and abandoned the wells.

Emerald became interested in leasing a portion of the tract originally leased by Exxon. Emerald examined the economic viability of assuming operations on the property by reviewing Exxon's public filings on the field with the Texas Railroad Commission. In so doing, Emerald reviewed the Texas Railroad Commission Form W–3 Plugging Reports, which specify the methodology used to plug and abandon the wells. Emerald ultimately leased a portion of the field originally held by Exxon.

Upon acquiring the lease and starting the reentry process, Emerald encountered numerous unexpected obstacles in its redevelopment of the field. Emerald discovered tubing, refuse, and junk in some of the wellbores. Emerald also discovered cut casing,[4] unidentified plugs, or plugs located at intervals differing from those identified on the Form W–3s, and other obstructions in the wells. Various wells contained tank bottoms or other environmental contaminants. Ultimately, Tommy Lynch of Emerald estimated that eighty to ninety percent of the Form W–3s failed to accurately describe the plugging methodology utilized for the wells and failed to accurately describe the physical status of the wells.

Emerald retained several different experts in the field of reentering plugged wells to assist it in the reentry process. Nevertheless, the problems were not isolated and the wells were uniformly difficult and disproportionately expensive, or impossible, to reenter. Emerald also requested, but failed to receive, the well records directly from Exxon. Emerald ultimately obtained several of Exxon's well logs for the field from Quintana. The plugging procedures delineated in these well logs differed in salient respects from those described in Exxon's public filings regarding the same wells. After reviewing these documents, speaking with its experts, and talking with several individuals who had performed some of the plugging at Exxon's direction, Emerald concluded that Exxon had engaged in a deliberate pattern of sabotaging the wells in the Mary Ellen O'Connor Field to prevent reentry, while continuing to profit from operations on the contiguous tract. Emerald and the royalty owners brought suit against Exxon for, inter alia, common law waste, statutory waste, negligence per se, and tortious interference. Based on field analyses produced by Exxon during discovery, the royalty owners further brought suit against Exxon for breach of contract by failing to fully develop the field.

## II. Exxon's Appeal

### A. Introduction

The jury found against Exxon and in favor of the royalty owners on all issues submitted. The jury found that Exxon committed waste on property or production in which the royalty owners owned an interest, and that, in plugging the wells, Exxon failed to act as a reasonably prudent operator would have under the same or similar facts and circumstances. The jury found that the intervenors discovered,

---

**4.** Exxon plugged the wells at the field by cutting, but not pulling or removing, the well casing. According to testimony at trial, the standard plugging procedure was to perforate casing and leave it in place, rather than cutting it, during plugging. If casing were to be cut during the plugging process, it would ordinarily be pulled from the wellbore. Cut casing, as opposed to perforated casing, was a continuing impediment to reentry because of its propensity to shift in the wellbore and the high probability of future loss of the wellbore or a portion of the well.

or, in the exercise of due diligence, should have discovered the waste on January 24, 1995. The jury awarded the intervenors $5,000,000 for the cost to drill new wells, the value of the minerals that could not be recovered, and the loss of bonus payments. The jury also found that Exxon acted with malice and awarded the intervenors $10,000,000 in exemplary damages.

The jury further found that Exxon failed to comply with the development provision in the leases that required Exxon to "prosecute diligently a continuous drilling and development program until said tract is fully developed for oil and gas," and that Exxon fraudulently concealed its failure to develop the field. The jury found that the intervenors knew, or in the exercise of reasonable diligence, should have known that Exxon fraudulently concealed its failure to fully develop under the leases in February of 1999. The jury awarded the intervenors $3,600,000 for Exxon's breach of contract, as the amount that the intervenors "would have received for the minerals produced had Exxon fully developed the Oil and Gas Leases less the costs of operation and production and any royalty received from Emerald Oil & Gas L.C."

The trial court rendered judgment on the verdict and awarded the intervenors $8,600,000 in actual damages, $10,000,000 in punitive damages, and $2,795,000 in prejudgment interest. Exxon appeals this judgment by eleven issues and numerous subissues.

## B. Statute of Limitations for Waste

In several issues, Exxon contends that the statute of limitations bars the intervenors' waste claim. In its first issue, Exxon argues that limitations bars the intervenors from recovering on their waste claim because they filed suit against Exxon more than two years after Exxon completed its plugging operations. In its second issue,

Exxon contends that the trial court erred in allowing the intervenors to rely on the discovery rule to delay the running of limitations on their "otherwise time-barred" waste claim. In subissues, Exxon argues that the discovery rule is inapplicable (a) when the intervenors have taken the position that their waste claim is merely for temporary injury to real property; (b) when, in a typical waste case, the nature of the injury is readily discoverable from a wide variety of sources, including public documents and an inspection of the premises; and (c) when the evidence of any damages is necessarily the subject of an expert swearing match that precludes the evidence from being objectively verifiable. In a fourth subissue, Exxon claims that, even if the discovery rule arguably applies to the waste claim, the intervenors are precluded from relying on the discovery rule because the evidence "conclusively" shows that they knew or reasonably should have known of their injury more than two years before filing suit.

Statutes of limitations are intended to compel plaintiffs to assert their claims "within a reasonable period of time while the evidence is fresh in the minds of the parties and witnesses." *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 734 (Tex.2001) (citing *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex.1996)). Generally, when a cause of action accrues is a question of law. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 221 (Tex.2003). We review questions of law de novo, without deference to the trial court's conclusions. *State v. Heal*, 917 S.W.2d 6, 9 (Tex.1996).

As a general rule, a cause of action accrues and the statute of limitations begins to run when facts come into existence that authorize a party to seek a judicial remedy. *Provident Life & Acci-*

*dent Ins. Co.,* 128 S.W.3d at 221. In most cases, a cause of action accrues when a wrongful act causes a legal injury, regardless of when the plaintiff learns of that injury or if all resulting damages have yet to occur. *Id.; see S.V. v. R.V,* 933 S.W.2d 1, 4 (Tex.1996).

■ The discovery rule exception to the statute of limitations operates to defer accrual of a cause of action until the plaintiff knows or, by exercising reasonable diligence, should know of the facts giving rise to the claim. *Horwood,* 58 S.W.3d at 734.

The injury at issue in the instant case is the waste of hydrocarbons. The statute of limitations for waste is two years. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 16.003(a) (Vernon 2002). The jury found that the intervenors discovered, or in the exercise of due diligence, should have discovered the waste on January 24, 1995. Intervenors first brought suit against Exxon in August and September of 1996, less than two years after the date found by the jury.

Exxon contends that the statute of limitations bars the intervenors' recovery for waste given that the intervenors filed suit against Exxon more than two years after Exxon completed its plugging operations in the field. According to the evidence adduced at trial, Exxon plugged and abandoned all of the wells in the field by August 16, 1991. We agree that the statute of limitations would bar intervenors' cause of action for waste unless the discovery rule applies to defer accrual of this cause of action.

Exxon first contends that the discovery rule is not applicable because the intervenors claim that their waste claim is a temporary injury to real property, as opposed to a permanent injury to real property. The supreme court has recognized, but not addressed, the issue regarding whether the categorization of an injury as permanent or temporary affects the run-

ning of limitations. *See HECI Exploration Co. v. Neel,* 982 S.W.2d 881, 885–86 (Tex.1998) ("To resolve the issues in this case, we need not decide whether the injury ... was permanent or temporary and the effect, if any, that distinction may have on limitations."). *Compare Mitchell Energy Corp. v. Bartlett,* 958 S.W.2d 430, 436 (Tex.App.-Fort Worth 1997, writ denied) (discussing discovery rule when injury to water well was found to be permanent injury to real property) *with Apache Corp. v. Moore,* 891 S.W.2d 671, 679–80 (Tex. App.-Amarillo 1994, writ denied) (holding that injury to royalty interest was a temporary injury), *vacated on other grounds,* 517 U.S. 1217, 116 S.Ct. 1843, 134 L.Ed.2d 945 (1996).

■ As recently articulated by the Texas Supreme Court, there are three distinct consequences that result from categorizing an injury as permanent or temporary: (1) whether damages are available for future or only past injuries; (2) whether one or a series of suits is required; and (3) whether claims accrue, and thus limitations begin, with the first or each subsequent injury. *Schneider Nat'l Carriers, Inc. v. Bates,* 147 S.W.3d 264, 275 (Tex. 2004) (discussing the law of nuisance). In terms of limitations, a permanent nuisance claim accrues when injury first occurs or is discovered; a temporary nuisance claim accrues anew upon each injury. *See id.* at 270.

Exxon's argument that recovery is barred is untenable for a number of reasons.

■ First, Exxon seizes upon argument made by counsel at trial, outside the presence of the jury, in support of its assertion that intervenors claim theirs was a temporary injury. However, Exxon's argument ignores the fact that the intervenors submitted and received favorable jury findings

awarding damages for the cost to drill new wells, the value of the minerals that cannot be recovered, and the loss of bonus payments. Accordingly, we cannot say that the intervenors have wholly characterized their damages as temporary. *See* TEX.R. CIV. P. 48 (parties may plead alternative or hypothetical theories and allege claims or defenses that are inconsistent); TEX.R. CIV. P. 47 (plaintiff may ask for relief in the alternative or of several different types). More importantly, the determination whether an injury is categorized as temporary or permanent is either made by the court, as a matter of law, or is a question of fact for the jury. *See Schneider*, 147 S.W.3d at 281. The parties' own characterization of the claims at issue is not controlling.

■ Second, contrary to Exxon's position, the discovery rule may apply whether the injury is permanent or temporary. *See id.* at 291 n. 138; *see generally Bayouth v. Lion Oil Co.*, 671 S.W.2d 867, 868 (Tex.1984); *cf. Burke v. Union Pac. Res. Co.*, 138 S.W.3d 46, 60 (Tex.App.-Texarkana 2004, pet. denied) ("In actions for damage to property, Texas courts have consistently applied the discovery rule.").

Third, and finally, we question the applicability of the distinction between temporary and permanent damage to land, traditionally applied in nuisance cases, to a case involving waste of oil and gas and breach of contract. The injuries in the instant case do not readily fall within either temporary or permanent categories, and in fact display aspects of both.

■ Exxon next contends that the discovery rule does not apply in this case because the alleged waste was neither inherently undiscoverable nor objectively verifiable. The discovery rule applies if (1) the injury is inherently undiscoverable, and (2) the evidence of the injury is objectively verifiable. *HECI Exploration Co.*,

982 S.W.2d at 886; *Velsicol Chem. Corp. v. Winograd*, 956 S.W.2d 529, 531 (Tex.1997).

■ An injury is inherently undiscoverable if it is, by its nature, unlikely to be discovered within the prescribed limitations period despite due diligence. *Horwood*, 58 S.W.3d at 734–35; *Altai*, 918 S.W.2d at 456. We determine whether an injury is inherently undiscoverable on a categorical basis because such an approach "brings predictability and consistency to the jurisprudence." *Apex Towing Co. v. Tolin*, 41 S.W.3d 118, 122 (Tex.2001). Accordingly, the question here is not whether the intervenors discovered their injury during the limitations period, but whether the intervenors' injury is "the type of injury that generally is discoverable by the exercise of reasonable diligence." *HECI*, 982 S.W.2d at 886.

■ As owners of mineral interests, intervenors had some obligation to exercise reasonable diligence in protecting their interests. *Horwood*, 58 S.W.3d at 735. Intervenors could turn to the lessee for information and could look to records publicly filed with the Railroad Commission. However, neither source would indicate waste of hydrocarbons. Damage to subsurface wellbores cannot be determined by visual inspection or even a review of publicly available records. We note that intervenors need not prove that the injury was impossible to discover, but only that it was difficult to learn of the injury. *See S.V.*, 933 S.W.2d at 7. We hold that waste as alleged in this case is, by its nature, unlikely to be discovered within the prescribed limitations period despite due diligence.

■ We next consider whether the injury is objectively verifiable. An injury is objectively verifiable if the presence of injury and the producing wrongful act can-

not be disputed, and the facts upon which liability is asserted are demonstrated by direct, physical evidence. *Altai*, 918 S.W.2d at 455; *S.V.*, 933 S.W.2d at 6–7; *Hay v. Shell Oil Co.*, 986 S.W.2d 772, 777 (Tex.App.-Corpus Christi 1999, pet. denied). While expert testimony alone does not suffice, recognized expert opinion on a particular subject could be so near consensus that, in conjunction with objective evidence, it could provide the verification required. *Hay*, 986 S.W.2d at 777; *see S.V.*, 933 S.W.2d at 15.

In the instant case, the record is replete with physical evidence pertaining to the intervenors' injury, that is, cut casing, shifted casing, refuse and other junk in the wellbores, and unexpected plugs and obstacles in the wellbores. Experts testified that the wells were damaged. It is undisputed that Exxon was the party responsible for plugging and abandoning the wells in the field. Accordingly, intervenors' injury is objectively verifiable. *Compare Gaddis v. Smith*, 417 S.W.2d 577, 578 (Tex.1967) (presence of sponge in plaintiff's body and how it got there were undisputable) *with Robinson v. Weaver*, 550 S.W.2d 18, 21–22 (Tex.1977) (negligent diagnosis is subject to proof only by expert hindsight, and therefore discovery rule does not apply).

We conclude that the intervenors' injury is inherently undiscoverable and the evidence of injury is objectively verifiable. Accordingly, the discovery rule applies. *HECI Exploration Co.*, 982 S.W.2d at 886

In its fourth subissue, Exxon claims that, even if the discovery rule applies, the intervenors are precluded from relying on the discovery rule because the evidence "conclusively" shows that they knew or reasonably should have known of their injury more than two years before filing suit. Exxon focuses its argument on a June 1994 letter from Tom Taylor at Emerald to the intervenors, explaining the progress of reentry on some of the wells. Specifically, Exxon points to language in the letter indicating that casing had been cut on the B–11, B–1, and A–3 wells and that junk had been found in the A–10 well.

In a trial on the merits, the party seeking the benefit of the discovery rule to avoid limitations has the burden of pleading and proving the discovery rule. *Woods v. William M. Mercer*, 769 S.W.2d 515, 518 (Tex.1988). Inquiries involving the discovery rule usually entail questions for the trier of fact. *Childs v. Haussecker*, 974 S.W.2d 31, 44 (Tex.1998). However, the commencement of the limitations period may be determined as a matter of law if reasonable minds could not differ about the conclusion to be drawn from the facts in the record. *Id.*

In the instant case, the jury found that the intervenors discovered or in the exercise of due diligence should have discovered the waste, if any, by Exxon, on January 24, 1995. According to the testimony adduced at trial, this is the date on which representatives from Emerald met with the intervenors and informed them about the full extent of damage to the wells and the numerous discrepancies between the public reports on the pluggings and Emerald's actual findings regarding the wells. By this time, Emerald had consulted with many reentry specialists. According to Glenn Lynch of Emerald, the royalty interest owners had asked for a status on the lease, and at this time he felt it was important to disclose to the royalty interest owners the condition of their mineral interests. At this January meeting, Lynch told the royalty interest owners that the problems with the wells were not isolated but were pandemic and that the problems were unusual and atypical. We conclude that the 1994 letter does not es-

tablish discovery of the waste as a matter of law. Instead, the discovery rule tolls limitations until the intervenors knew of enough damage to know that the problems regarding the wells were not isolated. *PPG Indus. v. JMB/Houston Ctrs. Ltd. P'ship*, 146 S.W.3d 79, 94 (Tex.2004). There were 121 wells on the field, and the letter references reentry or the commencement of reentry on only 14 wells as of June 8, 1994. Based on the testimony at trial, it would not be unexpected to encounter a few difficulties in reentering some of the wells. In short, we are not willing to say that finding a few isolated problems on a small number of the wells that had been reentered to date establishes field-wide knowledge regarding systemic damage to some numerous wells as a matter of law. *See id.; Cornerstones Mun. Util. Dist. v. Monsanto Co.*, 889 S.W.2d 570, 576–77 (Tex.App.-Houston [14th Dist.] 1994, writ denied) (discovery rule does not end when the first leak is discovered; nor does it continue until all the leaks are known; instead, it ends when an owner knows of enough leaks to indicate the problem is not isolated); *Bayou Bend Towers Council of Co–Owners v. Manhattan Constr. Co.*, 866 S.W.2d 740, 742–43 (Tex.App.-Houston [14th Dist.] 1993, writ denied) (holding same with respect to leaking windows and roof). Thus, the earliest point at which intervenors can be properly charged with knowledge of the damage is, as the jury found, January 1995, which is less than two years before they filed suit in September 1996.

We overrule Exxon's first two issues and its numerous subissues regarding the statute of limitations for waste.

## C. Statutory and Common Law Waste

In its third issue, Exxon argues that the trial court erred in granting judgment in favor of the intervenors on the basis of the jury's finding that Exxon committed waste. In subissues, Exxon argues that: (a) the intervenors are precluded from recovering for statutory waste when section 85.321 of the Texas Natural Resources Code does not create a private cause of action for waste, and only prohibits waste in certain contexts; (b) the intervenors' cause of action for common law waste sounds only in contract and not in tort; (c) the trial court erred in instructing the jury that the term "waste" may include "whatever dictates of reason, fairness, and good judgment under all the facts would lead one to conclude was wasteful," when that definition is not found in the Texas Natural Resources Code; (d) the evidence is legally and factually insufficient to support a finding that Exxon committed common law waste or statutory waste; and (e) the Dunn and O'Connor intervenors are precluded from recovering under a theory of common law waste because they failed to plead such a theory.

### 1. Statutory Waste

We first address Exxon's contention that there is not a statutory cause of action for waste. We have previously addressed this issue in a companion case, *Emerald Oil & Gas, L.C. v. Exxon Corp.*, —— S.W.3d ——, 2005 WL 167051, No. 13–99–757–CV, 2005 Tex.App. LEXIS 591 (Tex.App.-Corpus Christi Jan. 27, 2005, pet. filed), and we now reiterate our conclusion that there is a private cause of action for statutory waste. *See id.* —— S.W.3d at ———— ——, 2005 WL 167051 at **4–5*12–*14. Although Exxon argues to the contrary, section 85.321 of the Texas Natural Resources Code provides a statutory cause of action for waste. Section 85.321 of the code states that:

A party who owns an interest in property or production that may be damaged by another party violating the provisions of this chapter that were formerly a part

of Chapter 26, Acts of the 42nd Legislature, 1st Called Session, 1931, as amended, or another law of this state prohibiting waste or a valid rule or order of the commission may sue for and recover damages and have any other relief to which he may be entitled at law or in equity. Provided, however, that in any action brought under this section or otherwise, alleging waste to have been caused by an act or omission of a lease owner or operator, it shall be a defense that the lease owner or operator was acting as a reasonably prudent operator would act under the same or similar facts and circumstances.

TEX. NAT. RES.CODE ANN. § 85.321 (Vernon 2001). This language is clear and unambiguous, and we will interpret it as written. Our reading of the statute is in accord with other cases referencing the effect of section 85.321. *See HECI Exploration Co.*, 982 S.W.2d at 890 ("When a mineral or royalty interest owner is damaged by a violation of the conservation laws of this state or a Railroad Commission rule or order, section 85.321 of the Texas Natural Resources Code ... expressly provides for a damage suit against the offending operator."); *In re Apache Corp.*, 61 S.W.3d 432, 435 (Tex.App.-Amarillo 2001, orig. proceeding) (through section 85.321, "the legislature unmistakably declared its intent to allow those owning an interest in realty who have suffered injury due to a violation of some rule or order of the TRC to sue for and recover damages and other relief."); *H.G. Sledge, Inc. v. Prospective Inv. & Trading Co.*, 36 S.W.3d 597, 606 n. 10 (Tex. App.-Austin 2000, pet. denied) (acknowledging that section 85.321 "provides jurisdiction for suits for damages"); *see also Turnbow v. Lamb*, 95 F.2d 29, 31 (5th Cir.1938) (construing predecessor statute).

Contrary to these authorities, Exxon relies on *Magnolia Petroleum Co. v. Blank-*enship, 85 F.2d 553 (5th Cir.1936), for the proposition that the predecessor to section 85.321 "did not grant a new, private cause of action for damages or other relief not previously available to a property owner or producer." *See id.* at 556. We conclude that such reliance is misplaced, however, because the Fifth Circuit's decision in 1936 concerned the enforcement of a Railroad Commission order rather than a matter of civil litigation between private parties. *See id.* Furthermore, we are guided by the precedent of the Texas Supreme Court and our sister appellate courts, who have addressed the issue as discussed above.

Our conclusion is also supported by the fact that other provisions of the natural resources code also recognize private causes of action. *See, e.g.,* TEX. NAT. RES. CODE ANN. § 111.095 (Vernon 2001); *id.* § 134.182 (Vernon 2001). Moreover, such an interpretation is consistent with the overall legislative intent to prevent waste and preserve natural resources. *See, e.g.,* TEX. NAT. RES.CODE ANN. § 89.001 (Vernon 2001) (stating that the "conservation and development of all natural resources of this state are declared to be a public right and duty"). In this regard, we reiterate that the preservation of our natural resources is an issue of constitutional dimension. *See* TEX. CONST. art. 16, § 59 (stating that "the preservation and conservation of all such natural resources of the State are each and all hereby declared public rights and duties; and the Legislature shall pass all such laws as may be appropriate thereto").

■ Exxon next argues that the natural resources code only prohibits waste in the "production, storage, or transportation" of oil or gas. *See* TEX. NAT. RES.CODE ANN. § 85.045 (Vernon 1993). According to Exxon, the intervenors do not complain about production, storage, or transporta-

tion of oil or gas, but instead complain only that Exxon committed waste in plugging. We disagree with Exxon's narrow reading of the natural resources code. *See* TEX. NAT. RES.CODE ANN. § 85.045 (offering various definitions of waste); *R.R. Comm'n v. Shell Oil Co.*, 146 Tex. 286, 206 S.W.2d 235, 240 (1947) (discussing similar language in precursor statute regarding production, storage, or transportation as "sweeping language . . . by which all waste in the handling of oil and gas was declared unlawful"). Based on the plain language of the code and long-standing precedent from the Texas Supreme Court, we conclude that the code prohibits all waste of oil or gas, including the type of waste caused by Exxon in the instant case. *See* TEX. NAT. RES.CODE ANN. § 85.045; *Shell Oil Co.*, 206 S.W.2d at 240.

### 2. Contract or Tort Law

Exxon further contends that the intervenors may not recover for common law waste because the intervenors' cause of action sounds in contract rather than tort law. According to Exxon, its duties and responsibilities were governed wholly by the lease.

▮▮▮▮ A party's actions can breach duties in tort, contract, or both. *See Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex.1986). In determining the type of action brought, we look to the substance of the cause of action rather than the manner in which the party pleaded the cause of action. *Id.* at 617–18. In determining whether a plaintiff's cause of action can be characterized as a breach of contract or a tort, the courts (1) look to the source of the defendant's duty to act, and (2) consider the nature of the remedy or damages sought by the plaintiff. *Southwestern Bell v. DeLanney*, 809 S.W.2d 493, 494–95 (Tex.1991).

▮▮▮▮ We reject Exxon's contention. In the instant case, the source of Exxon's duty to act arises not only from the lease, but also from the common law. Texas law has long recognized that a cause of action for negligent waste or destruction of minerals may be maintained by a mineral or royalty owner. *Elliff v. Texon Drilling Co.*, 146 Tex. 575, 583, 210 S.W.2d 558, 563 (1948); *see Amoco Prod. Co. v. Alexander*, 622 S.W.2d 563, 572 (Tex.1981). Exxon's duty to avoid waste is grounded in prohibitions against waste so fundamental that they are enshrined in the Texas constitution. *See* TEX. CONST. art. 16, § 59. We reach the same result when we consider the nature of the remedy or damages sought by the plaintiff. *Southwestern Bell*, 809 S.W.2d at 494–95. The injury is not merely the economic loss to the subject matter of the contract itself, but damaged or destroyed wellbores and ultimately, the loss of oil and gas reserves. Moreover, in some sense, the damage enures to citizens of the state and all who are injured by the loss of fuel.

Exxon seeks to support its argument with *Amoco Prod. Co. v. Alexander*, 622 S.W.2d 563, 571 (Tex.1981), *Abraxas Petroleum Corp. v. Hornburg*, 20 S.W.3d 741, 753 (Tex.App.-El Paso 2000, no pet.), and *Harrison v. Bass Enters. Prod. Co.*, 888 S.W.2d 532, 536 (Tex.App.-Corpus Christi 1994, no writ). These cases are distinguishable. The duties and injuries in each of these cases sound in contract alone, and the injured parties were seeking the benefit of their bargains as provided by the contracts between the parties. In contrast, in this case, the evidence adduced at trial indicates a tort separate and apart from the contractual agreement, that is, the intentional destruction of wellbores and the intentional prevention of reentry in wells. Intervenors' claims based on this destruction are independent from and un-

related to any contractual relationship between the parties.

### 3. Jury Instructions

▬ Exxon next contends that the trial court erred in instructing the jury that the term "waste" may include "whatever dictates of reason, fairness, and good judgment under all the facts would lead one to conclude was wasteful" when that definition is not found anywhere in Chapter 85 of the Texas Natural Resources Code, which contains the statutory definition of waste.[5] However, at trial, Exxon's objection to this definition was that subpart (d) was "unconstitutionally vague and fails to provide the jury any guidance in answering the question." To preserve an issue for appeal, the objecting party must distinctly point out the objectionable matter and the specific grounds of the objection. Tex.R. Civ. P. 274; Tex.R.App. P. 33.1(a). Otherwise, the objection is waived. Tex.R.App. P. 33.1(a). Where the objection at trial is not the same as the complaint presented on appeal, the complaint is not preserved for appellate review. *A.G.E., Inc. v. Buford,* 105 S.W.3d 667, 678 (Tex.App.-Austin 2003, pet. denied); *Borden Inc. v. Guerra,* 860 S.W.2d 515, 525 (Tex.App.-Corpus Christi 1993, writ dism'd by agr.); *Exxon Corp. v. Allsup,* 808 S.W.2d 648, 655 (Tex.App.-Corpus Christi 1991, writ denied).

### 4. Legal and Factual Sufficiency of Waste

Exxon further argues that the evidence is legally and factually insufficient to support a finding of common law waste or statutory waste.

When a party not bearing the burden of proof on an issue challenges the legal sufficiency of the evidence, we view the evidence in the light most favorable to the jury's finding, disregarding all evidence and inferences to the contrary. *Lenz v. Lenz,* 79 S.W.3d 10, 19 (Tex.2002). If more than a scintilla of evidence supporting the finding exists, we uphold the finding. *Id.* When reviewing a factual sufficiency challenge, we examine the entire record to determine whether the evidence supporting the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).

▬ We examine the record for evidence regarding the physical or economic waste or loss of hydrocarbons. *See* Tex. Nat. Res.Code Ann. § 85.045(3), (6), (11); *R.R. Comm'n v. Rowan Oil Co.,* 152 Tex. 439, 259 S.W.2d 173 (1953); *Shell Oil Co.,* 206 S.W.2d at 240. In the instant case, the majority of the wells plugged by Exxon

---

**5.** Question one asked:
 Did Exxon commit waste on property or production in which the Plaintiff–Intervenors own an interest?
 "Waste" means, among other things,—
 a. underground waste or loss, however caused; or
 b. physical waste or loss incident to or resulting from drilling, equipping, locating, spacing, or operating a well or wells in a manner that reduces or tends to reduce the total ultimate recovery or oil or gas from any pool; or
 c. surface or subsurface waste of hydrocarbons, including the physical or eco-

nomic waste or loss of hydrocarbons; or
 d. whatever dictates of reason, fairness, and good judgment under all the facts would lead one to conclude is wasteful.
Subsections a, b, and c closely track the statutory language of section 85.045 subsections 3, 6, and 11. Tex Nat. Res.Code Ann. § 85.045(3), (6), (11). Subsection d follows the common law rule of waste as dictated by the Texas Supreme Court in *R.R. Comm'n v. Shell Oil Co.,* 146 Tex. 286, 206 S.W.2d 235 (1947); *see R.R. Comm'n v. Rowan Oil Co.,* 152 Tex. 439, 259 S.W.2d 173 (1953).

were difficult or impossible to reenter, and the costs associated with reentry were accordingly much higher than would have ordinarily been expected. The difficulties in reentry resulted from junk and other debris in the wellbores and from cut, rather than perforated, casings. Based on our review of the record evidence, numerous items were discovered in the wellbores, including wrenches, drilling bits, a packer, nuts, bolts, tubing, pieces of pipe, and assorted nondrillable junk. On at least one of the wells, "buckets" of debris were removed. On others, nondrillable materials in the wellbore prevented or hampered reentry. At trial, Exxon's witnesses did not dispute that (1) there was junk in the wells, (b) Exxon was the only party who could have put the junk in the wells, or (c) junk in the wells made reentry difficult or impossible.

At trial, the evidence indicated that the Mary Ellen O'Connor Field was the only instance in which Exxon determined to plug and abandon an entire field, including producing wells. Matt Soulant, Exxon's division operation manager over South Texas, and other Exxon employees, acknowledged and agreed that cutting the casing, as opposed to perforating it, would make it impossible or at least more difficult to reenter a well. However, Soulant testified that the degree of difficulty required to reenter a well is not a consideration in plugging the well. From his perspective as an operations manager in the South Texas area, once a well was plugged and abandoned, he had no future concern with what occurred to that wellbore.

Other Exxon employees and former employees testified that cutting and leaving the casing was contrary to Exxon's usual practices in plugging and abandoning wells. Some testimony indicated that it was both more costly and more time-consuming to cut and abandon the casing.

Lonnie Vickery, who worked for Exxon during the plugging procedures, questioned his supervisor, Joe Gilpin, regarding why Exxon was cutting casing rather than perforating it on the Mary Ellen O'Connor Field, and "his answer to me was, it was a deterrent," and "Exxon felt like they drilled these wells, they bought the casing that ran in these wells, these were their wells, and they would plug them any way they wanted to, and they didn't want anybody going back into them." Gilpin denied this exchange at trial. Vickery also testified that he plugged producing wells on the Mary Ellen O'Connor Field. At the instructions of Jerry Schave, Vickery pumped approximately 1,000 to 1,500 barrels of tank bottoms into a producing well over the course of two to three days. According to Vickery, "you've got to know, when you're doing that, you're destroying that formation. I mean you're doing some severe damage to that gas formation. There's no ifs, ands or buts about that." Other experts testified that the plugging procedures used in the Mary Ellen O'Connor Field were singular, violative of standard practices, and definitely "vindictive." With respect to resultant economic and physical waste, Emerald declined a second lease on the field specifically because of the damage to the wellbores. The royalty interest owners and their expert George Hite testified that the intervenors would be unlikely to obtain a lease on the portion of the original Exxon lease not already leased by Emerald. Reentry costs on the wells far exceeded the norm. Some wells could not be reentered. There was testimony that Emerald was unable to reenter productive zones due to the condition of the casing. According to Hite, reserves were lost which could not be recovered.

Although there was conflicting testimony, we will not substitute our judgment for that of the jury's. *Golden Eagle Archery,*

*Inc., v. Jackson,* 116 S.W.3d 757, 761 (Tex. 2003) ("The jury is the sole judge of the credibility of witnesses and the weight to be given their testimony."). We conclude the evidence is legally and factually sufficient to support the jury's finding that Exxon committed waste.

### 5. Sufficiency of the Pleadings

■ Exxon argues that the Dunn and O'Connor intervenors are precluded from recovering under a theory of common law waste because they failed to plead such a theory. In the instant case, Emerald's petition against Exxon included a specific paragraph including the phrase "common law waste" as part of its title; however, the petition in intervention filed by the Dunn and O'Connor intervenors lacked any such specific title or caption.

We disagree with Exxon's contention.

■ A judgment must be based upon pleadings, and a plaintiff may not sustain a favorable judgment on an unpleaded cause of action, in the absence of trial by consent. *Stoner v. Thompson,* 578 S.W.2d 679, 682–83 (Tex.1979); *Oil Field Haulers Ass'n, Inc. v. R.R. Comm'n,* 381 S.W.2d 183, 191 (Tex.1964). The general rules concerning pleadings apply with equal force to an intervenor. *See* Tex.R. Civ. P. 61.

■ Texas follows a "fair notice" pleading standard, which looks to whether the opposing party can ascertain from the pleading the nature and basic issues of the controversy and what testimony will be relevant at trial. *Horizon/CMS Healthcare Corp. v. Auld,* 34 S.W.3d 887, 896 (Tex.2000). A pleading will be liberally construed in favor of the pleader and is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases his claim. *Stone v. Lawyers Title Ins. Corp.,* 554 S.W.2d 183, 186 (Tex.1977);

*see* Tex.R. Civ. P. 45, 47. A court should uphold the petition as to a cause of action that may be reasonably inferred from what is specifically stated, even if an element of the cause of action is not specifically alleged. *Boyles v. Kerr,* 855 S.W.2d 593, 601 (Tex.1993).

In the instant case, the Dunn and O'Connors' fourth amended petition includes numerous factual allegations regarding Exxon's actions with regard to waste, that is, the negligent waste or destruction of oil and gas. This petition specifically references the petition filed by Emerald and includes sections that expressly discuss Exxon's failure to act as a reasonably prudent operator and Exxon's negligence, both of which establish elements of the claim of waste. The petition states that "Defendants' conduct in the plugging and abandonment of the subject wells breaches the statutory duty to plug and abandon wells according to the Railroad Commission *and the duty to not commit waste of natural resources* " (emphasis added). The fourth amended petition is identical to that filed by the other intervenors with regard to the factual allegations of waste and, in comparison, only lacks a caption regarding common law waste. *See Brown v. Henderson,* 941 S.W.2d 190, 192 (Tex.App.-Corpus Christi 1996, no writ) (petition does not need to set forth formal title of the DTPA or indicate the specific sections in order to allege a DTPA claim). Construing the pleadings liberally, we conclude that the petition in intervention gave Exxon fair notice of the cause of action at issue.

■ Furthermore, even if we were to conclude that the common law waste claim was not included in the petition, we would conclude the issue was effectively tried by the implied consent of the parties. Tex.R. Civ. P. 67. In such instances, the issues shall be treated in all respects as if they

had been raised in the pleadings. *See id.* The failure to amend the pleadings shall not affect the result of the trial on these issues. *Id.*

Finally, if a petition omits an element of a cause of action or fails to state it with sufficient clarity, the defendant must specially except to the petition or he has waived his complaint. *See* Tex.R. Civ. P. 90; *Harlingen Irrigation Dist. v. Caprock Communications Corp.*, 49 S.W.3d 520, 534 (Tex.App.-Corpus Christi 2001, pet. denied). We note that Exxon filed a motion for leave to file an amended answer, including special exceptions, to the fourth amended petition; however, the record neither indicates that the court allowed Exxon to file its amended answer nor includes any ruling regarding the special exceptions therein. Further, Exxon's proposed special exceptions do not address the cause of action for waste.

We overrule Exxon's third issue and various subissues concerning waste.

### D. The Reasonably Prudent Operator

In its fourth issue, Exxon argues that the evidence conclusively establishes Exxon's defense that it acted as a reasonably prudent operator. According to Exxon, cutting the casing on the wells was the best way for it to ensure that no oil or gas could leak into the groundwater or otherwise cause environmental contamination. Exxon requested and obtained a jury question on its reasonably prudent operator defense. The jury found that Exxon had not acted as a reasonably prudent operator.

 Section 85.321, allowing for a suit for damages, provides, in part:

[I]n any action brought under this section or otherwise, alleging waste to have been caused by an act or omission of a lease owner or operator, it shall be a defense that the lease owner or operator was acting as a reasonably prudent operator would act under the same or similar facts and circumstances.

Tex. Nat. Res.Code Ann. § 85.321. We would note that the reasonably prudent operator standard incorporated in the statute has long been recognized by the common law. *See, e.g., Alexander,* 622 S.W.2d at 568; *Clifton v. Koontz,* 160 Tex. 82, 325 S.W.2d 684, 690 (1959); *Corzelius v. Harrell,* 143 Tex. 509, 186 S.W.2d 961, 967–68 (Tex.1945). Every claim of improper operation by a lessor against a lessee should be tested against the general duty of the lessee to conduct operations as a reasonably prudent operator in order to carry out the purposes of the oil and gas lease. *Alexander,* 622 S.W.2d at 568. The reasonably prudent operator standard is comprised of three elements: (1) to act in good faith; (2) with competence; and (3) with due regard to the interest of the lessor as well as its own interest. *Hurd Enters. v. Bruni,* 828 S.W.2d 101, 109 n. 10 (Tex.App.-San Antonio 1992, writ denied).

 George Hite testified that Exxon did not comply with Railroad Commission requirements or industry standard in cutting casing without intending to pull it. Rock Thomas, hired as a consultant to Emerald, testified that he had reentered between six and seven thousand wells, and the Mary Ellen O'Connor Field is the only place he had ever heard of where cut casing was left in the wellbore. Malcom Tudor, who worked for Exxon for more than thirty years and was the district operations superintendent, testified that he did not recall any operations involving cutting casing without attempting to pull it, and he could not think of a reason to cut the casing without attempting to pull it. All witnesses testified that cut casing and debris in the wellbores made reentry more difficult or impossible. Based on the fore-

going, there was evidence that Exxon's plugging procedures on the Mary Ellen O'Connor field both varied from those it utilized at other fields and conflicted with industry standards and commission rules. This is inconsistent with the definition of a reasonably prudent operator. The evidence is legally sufficient to support the jury's finding, and accordingly, we overrule Exxon's fourth issue.

### E. Actual Damages for Waste

In its fifth issue, Exxon argues that the trial court erred in awarding the intervenors $5,000,000 in actual damages for waste. In four subissues, Exxon specifically argues that: (a) the value of unrecovered minerals is an improper measure of damages for waste, "such that there is no evidence of the proper measure of damages;" (b) the evidence is legally and factually insufficient to permit the intervenors to recover any damages for the cost of drilling new wells when no one ever testified at trial that the intervenors would actually incur any of the costs of drilling new wells; (c) an award of damages for lost bonus payments is impermissibly speculative when there is no evidence that the intervenors actually would have entered into any agreement which would have allowed them to receive a bonus; and (d) an award of $5,000,000 in actual damages for waste is excessive when the maximum amount of damages supported by the intervenors' expert's testimony was $2,712,500.

With regard to the jury's finding of waste, the trial court asked the jury to consider only three elements of damages for waste: (1) the cost to drill new wells; (2) the value of the minerals that cannot be recovered; and (3) the loss of bonus payments. The jury found that $5,000,000 would "fairly and reasonably" compensate the plaintiff-intervenors.

### 1. Unrecovered Minerals

In its first subissue, Exxon contends that the value of unrecovered minerals is an improper measure of damages for waste, "such that there is no evidence of the proper measure of damages." According to Exxon, the proper measure of damages is the difference in the fair market value of the property immediately before and after the wasteful actions.

 While Texas cases have not delineated the correct measure of damages for the loss or destruction of minerals, they have considered the correct measure of damages for the removal of minerals from a plaintiff's land. In such a situation, the correct measure of damages depends on whether the defendant removed the minerals in good faith. *See Bender v. Brooks*, 103 Tex. 329, 127 S.W. 168, 169–70 (1910). When the removal of minerals is done in good faith, the plaintiff may recover the minerals' value in situ—that is, the value of the minerals in the ground. *Dahlstrom Corp. v. Martin*, 582 S.W.2d 159, 161 (Tex.App.-Houston [1st Dist.] 1979, writ ref'd n.r.e.). These damages are sometimes referred to as net profit damages. *See Maxvill–Glasco Drilling Co. v. Royal Oil & Gas Corp.*, 800 S.W.2d 384, 386 (Tex.App.-Corpus Christi 1990, writ denied). This measure is the fair market value of the minerals less the defendant's cost of bringing them to the surface and to market. *Bender*, 127 S.W. at 170. In contrast, when minerals are removed in bad faith, the plaintiff can recover damages for the minerals' enhanced value. *Karell v. West*, 616 S.W.2d 692, 697 (Tex.App.-Fort Worth 1981), writ ref'd n.r.e., 628 S.W.2d 48 (Tex.1982) (per curiam); *Dahlstrom Corp.*, 582 S.W.2d at 161. We see no reason why this law should not apply to ascertain the damages for waste.

To support its argument, Exxon cites *Hamman v. Ritchie*, 547 S.W.2d 698, 705 (Tex.App.-Fort Worth 1977, writ ref'd n.r.e.) ("On a waste question the measure of damages would be the difference in market value immediately before and after action as applied to any particular parcel of land upon which waste was alleged to have been committed."). *Hamman* is distinguishable from the instant matter because it does not concern loss of a mineral estate. Moreover, after *Hamman* was decided, the Texas Supreme Court clarified the law of waste:

> Waste is defined as 'permanent harm to real property, committed by tenants for life or for years, not justified as a reasonable exercise of ownership and enjoyment by the possessory tenant and resulting in a reduction in value of the interest of the reversioner or remainderman.'

> The common law theory of waste must not be confused with an action for negligent waste or destruction of minerals which may be maintained by a mineral or royalty owner. A royalty or royalty interest, whether created by grant or reservation or by lease, is an interest in real property and is a fee simple interest in land

> This is not a waste case. There has been no 'waste' as defined in section 85.046(a) of the Texas Natural Resource Code. There has been no negligent waste or destruction as occurred in *Elliff, supra.* Nor has there been an ultimate loss by a reversionary or remainder interest. The problem is the operation, by a common lessee, of some leases to the detriment of others.

*Alexander,* 622 S.W.2d at 572. Accordingly, *Hamman* does not control this issue. The value of the unrecovered minerals is a proper measure of damages for waste.

### 2. Costs for New Wells

Exxon argues that the evidence is legally and factually insufficient to permit intervenors to recover damages for the cost of drilling new wells when no one testified at trial that intervenors would actually incur the cost of drilling new wells. *Ludt v. McCollum,* 762 S.W.2d 575, 576 (Tex.1988) (purchaser of home could recover for foundation repair even though foundation had not yet been repaired and costs were not yet incurred); *Luna v. North Star Dodge Sales, Inc.,* 667 S.W.2d 115, 118 (Tex.1984) (plaintiff may recover for loss of use as an element of damage even where no monetary loss had been incurred by actually renting a replacement vehicle).

The law is clear that if a destroyed well can be reproduced and the reproduction costs do not exceed the value of the well, the plaintiff can recover damages for the cost of reproducing and equipping the well. *Atex Pipe & Sup. v. Sesco Prod. Co.,* 736 S.W.2d 914, 917 (Tex.App.-Tyler 1987, writ denied); *Am. Glycerin Co. v. Kenridge Oil Co.,* 295 S.W. 633, 636–37 (Tex.App.-Eastland 1927, no writ). Hite testified that seven new wells would have to be redrilled at a cost of $1.73 million.

Exxon argues that this cost would have been born by Emerald and not by the intervenors as lessors. However, trial testimony indicated that Emerald declined a second lease on the property and that intervenors would be unable to procure a new lessee for the field given the manner in which the wells had been plugged. Further, Exxon's argument fails to consider that the Emerald lease only encompassed a small portion of the total land leased by Exxon. Allowing the jury to consider that the intervenors would have to bear some of the costs for drilling new wells accords with the evidence adduced at trial.

### 3. Lost Bonus Payment

■ Exxon argues that the award of damages for lost bonus payments is improper because it is speculative. There can be no recovery for damages which are speculative or conjectural. *Lefton v. Griffith*, 136 S.W.3d 271, 277 (Tex.App.-San Antonio 2004, no pet.); *Cone v. Fagadau Energy Corp.*, 68 S.W.3d 147, 159 (Tex. App.-Eastland 2001, pet. denied).

According to testimony at trial, Emerald had agreed to pay intervenors a bonus of $600,000 for a second lease. The proposed lease, reflecting the $600,000 bonus payment, was in evidence. Glenn Lynch, for Emerald, testified that Emerald reached an agreement with all royalty owners to lease the deep rights to a large portion of the property, but Lynch decided not to go through with the proposed lease because of workover and reentry problems. Michael O'Connor testified that intervenors would have entered into the lease but for the fact that Emerald did not pursue it. Both parties to the proposed lease directly traced the failure of the lease to the damages caused by Exxon.

Based on the foregoing testimony, we find no merit in Exxon's arguments that the intervenors' lost bonus damages are not recoverable because they are too speculative.

### 4. Sufficiency of the Evidence

■ Exxon contends the evidence is legally and factually insufficient to support an award of $5,000,000 in actual damages for waste. The standard of review for an excessive damages complaint is factual sufficiency of the evidence. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex.1998); *Brownsville Pediatric Ass'n v. Reyes*, 68 S.W.3d 184, 191 (Tex.App.-Corpus Christi 2002, no pet.); *N. Am. Refractory Co. v. Easter*, 988 S.W.2d 904, 912 (Tex.App.-Corpus Christi 1999, pet. de-

nied). We examine all of the evidence to determine whether the award is supported by sufficient evidence and order remittitur only if the award is so against the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Golden Eagle Archery, Inc.*, 116 S.W.3d at 771; *Sw. Tex. Coors, Inc. v. Morales*, 948 S.W.2d 948, 951 (Tex.App.-San Antonio 1997, no writ). If sufficient probative evidence exists supporting the jury's verdict, the reviewing court may not substitute its judgment for that of the jury. *J. Wigglesworth Co. v. Peeples*, 985 S.W.2d 659, 666 (Tex.App.-Fort Worth 1999, pet. denied).

■ When the jury is asked to award a single amount of damages, but is told that it may consider various elements in arriving at that amount, a challenge to the damages award must address all of the elements that could have been considered by the jury in making its total, single-amount award. *Golden Eagle Archery, Inc.*, 116 S.W.3d at 771. "If there is just one element that is supported by the evidence, the damages award will be affirmed if it is supported by the evidence." *Id.* (quoting *Greater Houston Transp. Inc. v. Zrubeck*, 850 S.W.2d 579, 589 (Tex.App.-Corpus Christi 1993, writ denied)).

■ Based on our review, the evidence is sufficient to support the jury's award for waste. According to George Hite, there were $4,765,626 worth of reserves remaining under the portion of the field that had not been leased by Emerald, and, given the damage evident on the Emerald tract, it would be unlikely that intervenors would be able to lease that property in the future. He further testified that there were $535,000 in non-recoverable reserves under the portion of the field that had been leased by Emerald. The lost bonus payment comprised $600,000. We conclude the jury's award was supported by suffi-

cient evidence and the award was not so against the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *See Golden Eagle Archery, Inc.,* 116 S.W.3d at 771. Accordingly, Exxon's fifth issue is overruled in its entirety.

## F. Punitive Damages

In its sixth issue, Exxon argues that the trial court erred in awarding the intervenors $10,000,000 in punitive damages on their waste claim. Exxon specifically argues that (a) the trial court improperly overruled Exxon's objection to a question which asked if Exxon acted with malice, when that question failed to connect Exxon's state of mind to the specific cause of action for which the intervenors sought punitive damages, and (b) chapter 85 of the Texas Nature Resources Code, by its absence of any language authorizing an award of punitive damages, precludes the intervenors from recovering punitive damages on their claim for statutory waste.

### 1. The Charge

Exxon contends that the trial court erred by submitting the "malice" question to the jury because it failed to connect Exxon's state of mind to the specific cause of action for which the intervenors sought punitive damages. The standard of review for alleged jury charge error is abuse of discretion. *Tex. Dep't of Human Servs. v. E.B.,* 802 S.W.2d 647, 649 (Tex.1990); *Rosell v. Cent. W. Motor Stages, Inc.,* 89 S.W.3d 643, 653 (Tex.App.-Dallas 2002, pet. denied). To determine whether alleged jury charge error is reversible, we consider the parties' pleadings, the evidence presented at trial, and the charge in its entirety. *See Hyundai Motor Co. v. Rodriguez,* 995 S.W.2d 661, 663 (Tex.1999). Error in the jury charge is reversible only if it probably caused the rendition of an improper judgment or probably prevented the appellant from properly presenting the case on appeal. *See* TEX.R.APP. P. 44.1(a); *Timberwalk Apts. v. Cain,* 972 S.W.2d 749, 756 (Tex. 1998).

In order to analyze Exxon's complaint, we must look at the structure of the charge. The first question submitted to the jury inquired whether Exxon committed waste. The second question, conditioned on an affirmative finding of waste, asked if Exxon acted as a reasonably prudent operator under the same or similar facts and circumstances. The third question, conditioned on the jury's finding that Exxon did not act as a reasonably prudent operator, asked when the plaintiff-intervenors discovered or should have discovered the waste. The fourth question, conditioned on the jury's findings that Exxon committed waste and did not act as a reasonably prudent operator, inquired about damages "if any, that resulted from such conduct." The fifth question, conditioned on the jury's finding that Exxon did not act as a reasonably prudent operator, asked if Exxon acted with malice. The jury found that Exxon acted with malice.

Considering the court's charge as a whole, we conclude that the jury charge adequately connected the malice question with the underlying tort of waste. The question concerning malice was predicated on findings concerning waste, and occurred sequentially in a cluster of questions regarding waste. *See Samedan Oil Corp. v. Intrastate Gas Gathering, Inc.,* 78 S.W.3d 425, 443–44 (Tex.App.-Tyler 2001, pet. granted, jdgmt. vacated w.r.m.); *Bradford v. Vento,* 997 S.W.2d 713, 730 (Tex.App.-Corpus Christi 1999), *rev'd on other grounds,* 48 S.W.3d 749 (Tex.2001). Accordingly, we reject Exxon's argument

that the trial court erred in its submission of malice to the jury.

## 2. Punitive Damages for Statutory Waste

In attacking the award of punitive damages for waste, Exxon further contends that plaintiff-intervenors are precluded from recovering punitive damages for statutory waste. According to Exxon's argument, because chapter 85 of the Texas Nature Resources Code does not expressly authorize the recovery of punitive damages, punitive damages may not be awarded for a finding of statutory waste.

▮ As an initial matter, we note that the waste question submitted to the jury combined statutory and common law waste. Therefore, punitive damages may have been predicated on a finding of common law waste. *See Golden Eagle Archery, Inc.*, 116 S.W.3d at 771. Moreover, we disagree with Exxon's contention that the natural resources code does not allow punitive damages for waste.

Our goal in construing a statute is to give effect to the Legislature's intent as expressed in the language of the statute. *See Horizon/CMS Healthcare Corp.*, 34 S.W.3d at 892. The plain language of section 85.321 of the natural resources code allows a party to recover "damages and have any other relief to which he may be entitled at law or in equity." *See* TEX. NAT. RES.CODE ANN. § 85.321. Based on the specific expansive language used by the legislature in section 85.321, we conclude that the Legislature did not intend to preclude punitive damages as a remedy for statutory waste. *See Horizon/CMS Healthcare Corp.*, 34 S.W.3d at 892 (discussing whether punitive damages can be awarded under statute providing for "civil liability for damages"). Moreover, this conclusion comports with analyses of other statutes that do not expressly address the

award of exemplary damages. *See, e.g., Azar Nut Co. v. Caille,* 734 S.W.2d 667, 668–69 (Tex.1987) (considering "damages" in retaliatory discharge statute to include punitive damages); *Castleberry v. Frost–Johnson Lumber Co.,* 283 S.W. 141, 142 (Tex.Comm'n App.1926, judgm't adopted) ("damages," unless limited, included exemplary damages under workers compensation act). Accordingly, we overrule Exxon's sixth issue.

## G. Statute of Limitations for Breach of Contract

In its seventh issue, Exxon argues that the statute of limitations bars intervenors from recovering on their breach of contract claim when the intervenors filed suit against Exxon more than four years after Exxon abandoned the Mary Ellen O'Connor Field. In its eighth issue, Exxon contends that the trial court erred in allowing the intervenors to rely on fraudulent concealment to toll the running of limitations. In three subissues, Exxon argues that: (a) the evidence conclusively shows that the intervenors knew or reasonably should have known of their cause of action more than four years before they filed suit against Exxon; (b) the trial court improperly instructed the jury, over Exxon's objection, on the elements of fraud by nondisclosure instead of the elements of fraudulent concealment; and (c) the jury's answer to question nine of the charge was immaterial because the jury merely determined the date by which the intervenors allegedly learned of the fraudulent concealment rather than the date by which the intervenors reasonably should have known of their cause of action.

## 1. Fraudulent Concealment

▮ Fraudulent concealment defers an action's accrual period until the plaintiff learns of, or should have discovered, "the

deceitful conduct or facts giving rise to the cause of action." *Earle v. Ratliff,* 998 S.W.2d 882, 888 (Tex.1999). Fraudulent concealment is an equitable doctrine that provides a defense to the bar of limitations. *Sauceda v. Kerlin,* 164 S.W.3d 892, 917 (Tex.App.-Corpus Christi 2005, pet. granted); *Santanna Natural Gas Corp. v. Hamon Operating Co.,* 954 S.W.2d 885, 890 (Tex.App.-Austin 1997, pet. denied). Under the doctrine of fraudulent concealment, the accrual of the plaintiff's cause of action is deferred because a defendant cannot be permitted to avoid liability for its actions by deceitfully concealing wrongdoing until the statute of limitations has run. *Sauceda,* 164 S.W.3d at 917. The essence of fraudulent concealment is (1) actual knowledge that a wrong has occurred, and (2) a fixed purpose to conceal the facts necessary for the plaintiff to know that the cause of action has accrued. *Id.; Arabian Shield Dev. Co. v. Hunt,* 808 S.W.2d 577, 584 (Tex.App.-Dallas 1991, writ denied).

■ The elements of fraudulent concealment are: (1) the existence of an underlying tort; (2) the defendant's knowledge of the tort; (3) the defendant's use of deception to conceal the tort; and (4) the plaintiff's reasonable reliance on the deception. *Sauceda,* 164 S.W.3d at 917; *Mitchell Energy Corp. v. Bartlett,* 958 S.W.2d 430, 439 (Tex.App.-Fort Worth 1997, pet. denied); *Arabian Shield Dev. Co.,* 808 S.W.2d at 585. To establish the affirmative claim of fraudulent concealment, the plaintiff has the burden of putting forth proof that raises an issue of fact with respect to that claim. *Sauceda,* 164

S.W.3d at 917; *Santanna Natural Gas Corp.,* 954 S.W.2d at 890.

Exxon contends that the evidence "conclusively" shows that intervenors knew or reasonably should have known of their breach of contract claim more than four years before they filed suit against Exxon.[6] Exxon contends that intervenors were aware of their contract claim when they initially filed suit for waste.

When reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 807–08 (Tex.2005).

■ We conclude that the evidence supports the jury's finding that Exxon fraudulently concealed its failure to develop the property and that intervenors neither discovered, nor in the exercise of reasonable diligence, should have discovered Exxon's failure to develop until February 1999. According to the trial testimony, intervenors first learned that Exxon failed to develop two productive zones in 1999 when Exxon first produced certain of its well logs for the field during discovery in the instant lawsuit.

Exxon representative Johnny Cortez testified that, during negotiations with intervenors regarding the terms of the leases, he refused to answer intervenors' questions about the field's remaining reserves. Despite having a contractual requirement to provide intervenors with all information about its operations and the oil and gas

---

**6.** We note that Exxon's contention herein drastically differs from its position when it filed a motion for continuance of the trial based on intervenors' amended petition including the breach of development claim. At that time, Exxon stated that the "predominant theory of the case appears to have changed substantially." According to Exxon's motion, the case had been based on "Exxon's alleged improper plugging of the wells ... and alleged waste of the hydrocarbons" on the leases, but the amended petition raised Exxon's "alleged failure to develop those leases before it surrendered them in 1991."

potentialities of the Mary Ellen O'Connor Field,[7] Exxon provided intervenors with raw data about the field, but consciously and deliberately chose not to provide intervenors with interpretive data on the field. According to Cortez, when Exxon finally agreed to furnish documents to the intervenors in the form of a reading room in 1990, Exxon did not tell the intervenors that they were not providing them with the interpretive data on the field.

Based on all the trial testimony, it is abundantly clear that intervenors took an active and inquiring role regarding development of their property and Exxon's proposed abandonment of the lease. The intervenors specifically queried Exxon about future prospects for the field, remaining reserves, and future development possibilities.

Morgan Dunn O'Connor testified that her understanding was that the reading room contained "everything" that Exxon had pertaining to the lease. T. Michael O'Connor testified that while Exxon had initially refused to provide what it called "proprietary" information about the field's potential, the reading room was to contain all information about the lease. The intervenors retained an expert to examine the documentation in the reading room to ascertain the prospects for the field.

George Hite testified that the reading room did not include information about productive zones H12 and FS75, and that information was not produced or available

to intervenors until it was produced during discovery in 1999. Exxon's employee, Joe Wylie, who performed a reservoir analysis on the field, told the jury that his interpretive data on the field was missing. Wylie testified that it would require analysis of well files for all 121 wells on the field in order to determine which zones were productive. Exxon did not dispute that some of the well files were missing even at the time of trial. Interestingly, some of the missing well files for the field were provided to Emerald's representatives from Quintana, Exxon's partner in production on an adjacent field.

We reject Exxon's contention that the evidence "conclusively" shows that intervenors were aware of the breach of the development clause more than four years before they initially brought suit. Viewing the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not, based on Exxon's own documentation, the field contained additional productive zones which Exxon did not develop. *See City of Keller*, 168 S.W.3d at 807. Exxon consciously withheld that documentation from intervenors until the instant lawsuit was filed.

### 2. Jury Charge on Fraudulent Concealment

We next review Exxon's complaint about the charge. Exxon contends that the trial

---

7. The leases provide: "Lessor shall at all times be entitled to full information covering all of lessee's operations on the leased premises or otherwise pertinent to lessor's interests. To this end, lessor, through her representative or representatives duly designated from time to time in writing, shall have free access to all operations conducted by lessee upon the leased premises and, at all reasonable times, to all of lessee's records and data pertaining thereto. Further, lessee shall furnish lessor, or lessor's duly accredited agent, copies of all logs, geological and geophysical reports, core analyses and all other such data and information available to lessee pertaining to the leased premises, their oil and gas potentialities and the investigating, exploration, development and producing operations conducted thereon by lessee, and all such instruments and information and data shall become the property of lessor."

court improperly instructed the jury, over Exxon's objection, on the elements of fraud by nondisclosure instead of the elements of fraudulent concealment.

In the instant case, the jury was asked if Exxon fraudulently concealed "its failure to develop in accordance with the terms of the Oil and Gas Leases" from the intervenors, and was instructed that:

Fraudulent concealment occurs when—

a. a party conceals or fails to disclose a material fact within the knowledge of that party,

b. the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discovery [sic] the truth,

c. the party intends to induce the other party to take some action by concealing or failing to disclose the fact, and

d. the other party suffers injury as a result of acting without knowledge of the undisclosed fact.

The jury found that Exxon fraudulently concealed its failure to develop in accordance with the terms of the oil and gas lease.

■ At trial, Exxon objected to the submission of this issue as follows:

Exxon objects to the submission of Question No. 8, because the evidence conclusively establishes that the Intervenors knew or should have known of the alleged failure to develop claim more than four years before this cause of action was brought.

Exxon further objects to the submission of Question No. 8 because this theory of recovery should not have been submitted, because the obligation is not as Plaintiffs have defined it; and if given the proper instruction, the evidence— proper construction, forgive me, the evi-

dence conclusively establishes that Exxon fully developed the leases in question.

Exxon further objects to the submission of Question No. 8, because there is no evidence that any material fact, as opposed to an opinion, has been concealed by Exxon or Exxon has failed to disclose such to the Intervenors.

Exxon does also request in connection with Question No. 8 an appropriate submission defining fraudulent concealment. It objects that the definition given is a definition that is consistent with a fraud cause of action as opposed to a fraudulent concealment cause of action, and also requests that the Court tender the following instruction to the jury in connection with Question No. 8 if it overrules Exxon's objections; that instruction being, fraudulent concealment ends when the party learns of facts or circumstances that would cause a reasonable person either to be aware of the existence of a cause of action or would cause a reasonable person to make inquiry that would lead to the discovery of the cause of action if pursued.

And I would like the record to reflect that I'm tendering that to the Court at this time.

I'm also tendering a correct instruction defining fraudulent concealment; that being, fraudulent concealment occurs only when a defendant has a duty to make disclosure and each of the following elements are established: A, there exists an underlying wrong; B, the Defendant has knowledge of the wrong; C, the Defendant concealed the wrong with the intent to deceive the Plaintiff; and D, the Plaintiff reasonably relies on the deception.

The instruction, or requested instruction, also continues, a duty of disclosure does not exist merely by the relationship

between a royalty owner and an oil and gas lessee.[8]

Exxon relies on *Advent Trust Co. v. Hyder*, 12 S.W.3d 534 (Tex.App.-San Antonio 1999, pet. denied), in arguing that the trial court improperly instructed the jury, over Exxon's objection, on the elements of fraud by nondisclosure instead of the elements of fraudulent concealment. In *Advent*, however, the jury question asked whether the defendant committed fraud, not whether the defendant fraudulently concealed its tort. *See id.* at 541–42. The same cannot be said in the instant case. Because the question adequately addresses the relevant issue, we cannot conclude that the trial court abused its discretion. *See Tex. Dep't of Human Servs.*, 802 S.W.2d at 649.

■ Moreover, Exxon's requested definition is not substantially correct insofar as it fails to apprise the jury that fraudulent concealment requires *either* the active suppression of truth or the failure to disclose when there is a duty to speak. *See* TEX.R. CIV. P. 278; *Placencio v. Allied Indus. Int'l, Inc.*, 724 S.W.2d 20, 21 (Tex. 1987). The instruction also unduly limits the duty to disclose, which can arise in several situations: (1) when there is a fiduciary or confidential relationship; (2) when one voluntarily discloses information, the whole truth must be disclosed; (3) when one makes a representation, new information must be disclosed if that new information makes the earlier representation misleading or untrue; and (4) when one makes a partial disclosure and conveys a false impression. *Hoggett v. Brown*, 971 S.W.2d 472, 487 (Tex.App.-Houston [14th Dist.] 1997, pet. denied). Moreover, the duty to disclose arises when one party knows that the other party is ignorant of

the true facts and does not have an equal opportunity to discover the truth. *Miller v. Kennedy & Minshew, Prof'l Corp.*, 142 S.W.3d 325, 345 (Tex.App.-Fort Worth 2003, pet. denied). And, ultimately, as a fundamental matter, we conclude that, whether or not there was error in the charge, in considering the parties' pleadings, the evidence presented at trial, and the charge in its entirety, any such alleged error probably did not cause the rendition of an improper judgment. *See Hyundai Motor Co.*, 995 S.W.2d at 663.

### 3. Materiality of Question Nine

■ Finally, Exxon contends that the jury's answer to question nine is immaterial because the question asked when the intervenors learned that Exxon fraudulently concealed its failure to develop rather than asking when intervenors learned of their cause of action against Exxon. Question nine, predicated on an affirmative answer to question eight, asked the jury: "By what date, if any, did Plaintiff–Intervenors know or, in the exercise of reasonable diligence, should have known that Exxon fraudulently concealed its failure to fully develop under the Oil and Gas leases?" According to the jury's response, plaintiff-intervenors knew or should have known of the failure to fully develop by February 1999.

In discussing the relevant accrual date in fraudulent concealment cases, the Texas Supreme Court has utilized language similar to that submitted to the jury in the instant case. *Shah v. Moss*, 67 S.W.3d 836, 841 (Tex.2001) (fraudulent concealment tolls limitations until the plaintiff discovers or could have discovered "the fraud"); *Earle v. Ratliff*, 998 S.W.2d 882,

---

**8.** On appeal, Exxon argues that the submitted question omits the element of reliance; however, Exxon did not raise this objection at trial and accordingly we will not consider it on appeal. *See* TEX.R.APP. P. 33.1.

888 (Tex.1999) (fraudulent concealment tolls the running of limitations until such time as the plaintiff learned of, or should have discovered, "the deceitful conduct or the facts giving rise to the cause of action"); *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*, 988 S.W.2d 746, 750 (Tex.1999) (limitations does not begin to run until the claimant, using reasonable diligence, discovered or should have discovered "the injury"); *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 352 n. 1 (Tex. 1990) (defendant is estopped from relying on the defense of limitations until the party learns of "the right of action"). Accordingly we overrule this issue.

## H. Breach of Contract

In its ninth issue, Exxon argues that, "as a matter of law," it complied with the unambiguous terms of its leases. In its first subissue, Exxon argues that the intervenors' interpretation of the leases' development clauses "improperly" continued to impose a duty of development on Exxon even after the leases terminated in 1990. In a second subissue, Exxon further contends that the intervenors' interpretation of the leases ignores the legal effect of the habendum clauses, which provide that the leases would remain in effect only for so long as Exxon produced oil or gas in paying quantities. Finally, in its third subissue, Exxon contends that the intervenors' interpretation of the leases improperly ignores the legal effect of the surrender clauses, which allowed Exxon to surrender its rights back to the intervenors at any time.

In construing an unambiguous oil and gas lease our task is to ascertain the parties' intentions as expressed in the lease. *Heritage Res. v. NationsBank*, 939 S.W.2d

118, 121 (Tex.1996); *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 727–28 (Tex.1981). To achieve this goal, we examine the entire document and consider each part with every other part so that the effect and meaning of one part on any other part may be determined. *Heritage Res.*, 939 S.W.2d at 121; *Steeger v. Beard Drilling Co.*, 371 S.W.2d 684, 688 (Tex.1963). We presume that the parties to a contract intend every clause to have some effect. *Heritage Res.*, 939 S.W.2d at 121; *Ogden v. Dickinson State Bank*, 662 S.W.2d 330, 331 (Tex. 1983). We give terms their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense. *Heritage Resources*, 939 S.W.2d at 121; *Western Reserve Life Ins. Co. v. Meadows*, 152 Tex. 559, 261 S.W.2d 554, 557 (Tex. 1953). We will enforce an unambiguous document as written. *Sun Oil Co.*, 626 S.W.2d at 728.

Exxon's argument under this issue and subissues focuses not on the legal or factual sufficiency of the evidence but on the relationship between three contractual clauses in the leases: the development clauses, the habendum clauses, and the surrender clauses.[9]

The development clauses provide, in part, if a well were completed as a producer of oil or gas in paying quantities, that "the lessee covenants and agrees to prosecute diligently a continuous drilling and development program until said tract is fully developed for oil or gas." Under the leases, a tract is deemed to be fully developed when at least one well has been drilled and completed in each horizon or stratum capable of producing in paying

---

**9.** The four leases are not identical; however, the differences do not affect the analysis herein.

quantities for each specified spacing protocol.

▊ ˙ A lease's habendum clause defines the mineral estate's duration. *Gulf Oil Corp. v. Southland Royalty Co.,* 496 S.W.2d 547, 552 (Tex.1973). For instance, a typical habendum clause states that the lease lasts for a relatively short fixed term of years (primary term) and then "as long thereafter as oil, gas or other mineral is produced" (secondary term). *See, e.g., Reid,* 337 S.W.2d at 269 n. 1; *see also* 1 SMITH & WEAVER, TEXAS LAW OF OIL & GAS § 4.3 (1996). In Texas, a habendum clause requires actual production in paying quantities. *Reid,* 337 S.W.2d at 269–70; *Garcia v. King,* 139 Tex. 578, 164 S.W.2d 509, 512 (Tex.1942). The term "production" is substantially equivalent to "production in paying quantities" even though the lease does not define production in those precise terms. *Clifton v. Koontz,* 160 Tex. 82, 325 S.W.2d 684, 690 (1959).

▊ In Texas, parties to an oil and gas lease may validly include a provision allowing the lessee to surrender all or part of the lease. *Ridge Oil Co. v. Guinn Invs., Inc.,* 148 S.W.3d 143, 152–53 (Tex.2004). The surrender clauses in the instant leases provide:

> Lessee may at any time surrender and relinquish any part or portion of the lands covered by this lease ... by executing and delivering to lessor a legally sufficient instrument of release.... Such release shall, upon the date of its delivery, terminate this lease as to the lands and sands therein released, but the lessee shall not thereby in any way be relieved or released of any past due charges or of performing any obligations which may have accrued under this lease prior to time of delivery of such release.... Neither can lessee by such release to lessor relieve themselves of all of the obligations assumed by lessee in

Article 3 [the development clause] of this lease.

▊ Exxon contends that, as a matter of law, it did not breach the unambiguous terms of its leases. According to Exxon, the intervenors contend that Exxon should have recompleted some of its wells in commercially productive zones even after Exxon could no longer profitably produce any oil and gas from the field, and ·this interpretation of the lease ignores the legal effect of the habendum and surrender clauses. Exxon points to the testimony of its reservoir engineer, Joel Wylie, who testified that Exxon could no longer produce oil or gas profitably from the field by the summer of 1990.

We disagree with Exxon's contentions. As a fundamental matter, Exxon's contentions fail to account for and harmonize the surrender clauses, which expressly prohibit surrender of the leases unless the tracts have been fully developed. According to Exxon, it had the right to surrender any area whether there was a producing well on it or not and regardless of the capacity of any well that might be on it. *See Rhoads Drilling Co. v. Allred,* 123 Tex. 229, 70 S.W.2d 576, 585 (Tex.1934). However, the surrender clauses at issue in this case are made expressly subject to the development obligation, and we harmonize these provisions and give effect to both. *See MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.,* 995 S.W.2d 647, 652 (Tex.1999).

According to the testimony at trial, the tracts had not been fully developed for all productive zones. Moreover, while Exxon contends that the lease was no longer capable of producing in paying quantities, this issue was a matter that was hotly disputed at trial. Hite testified that the leases were capable of producing in paying quantities until 1999. Testimony further indicates that Exxon did not drill and com-

plete wells in two productive horizons, H12 and FS75.

██ Although the habendum clause generally controls the mineral estate's duration, other clauses may extend the habendum clause's term. *Anadarko Petroleum Corp. v. Thompson,* 94 S.W.3d 550, 554 (Tex.2002); *Southland Royalty,* 496 S.W.2d at 552. When a lease terminates "is always a question of resolving the intention of the parties from the entire instrument." *Anadarko Petroleum Corp.,* 94 S.W.3d at 554; *Southland Royalty,* 496 S.W.2d at 552. Based on the leases as a whole, we conclude that the habendum and surrender clauses here were controlled by the development requirement, which Exxon failed to meet. Therefore, we overrule Exxon's ninth issue and subissues.

### I. Double Recovery

In its final two issues, Exxon argues that the trial court's judgment improperly awards the intervenors a double recovery. First, in issue number ten, Exxon argues that questions four and ten of the court's charge violate the single satisfaction rule by allowing the intervenors to recover twice for the alleged loss of the same reserves. In its eleventh and final issue, Exxon argues that the trial court's award of $18,600,000 amounts to an impermissible double recovery for the intervenors.

██ A party is generally entitled to sue and to seek damages on alternative theories. *Waite Hill Servs., Inc. v. World Class Metal Works, Inc.,* 959 S.W.2d 182, 184 (Tex.1998). A party is not, however, entitled to a double recovery, which exists when a plaintiff obtains more than one recovery for the same injury. *See id.* Under the one satisfaction rule, a plaintiff is entitled to only one recovery for any damages suffered. *Crown Life Ins. Co. v. Casteel,* 22 S.W.3d 378, 390 (Tex.2000); *Stewart Title Guar. Co. v. Sterling,* 822

S.W.2d 1, 7 (Tex.1991); *see Bradshaw v. Baylor Univ.,* 126 Tex. 99, 84 S.W.2d 703, 705 (1935). This rule applies when multiple defendants commit the same act as well as when defendants commit technically different acts that result in a single injury. *Crown Life Ins. Co.,* 22 S.W.3d at 390. Thus, notwithstanding an alternative theory of liability, a double recovery will result if multiple damage awards are the result of one injury. *Birchfield v. Texarkana Mem'l Hosp.,* 747 S.W.2d 361, 367 (Tex.1987). When the prevailing party fails to elect between alternative measures of damages, the court should render the judgment affording the greatest recovery. *Parkway Co. v. Woodruff,* 901 S.W.2d 434, 441 (Tex.1995).

Exxon contends that the damage awards for waste in question four and breach of contract in question ten are duplicative. The jury awarded $5,000,000 for waste, considering as elements of damages the cost to drill new wells, the value of the minerals that could not be recovered, and the loss of bonus payments. With regard to the breach of contract claim, in question ten the jury found that Exxon failed to comply with the contractual requirement that "... Lessee covenants and agrees to prosecute diligently a continuous drilling and development program until said tract is fully developed for oil and gas." The jury awarded $3,600,000 as the amount, "in reasonable probability, the Plaintiff–Intervenors would have received for the minerals produced had Exxon fully developed the Oil and Gas Leases less the costs of operation and production and any royalty received from Emerald Oil & Gas L.C."

██ Exxon argues that these damage awards overlap because they award damages for the same reserves, that is, those minerals which Exxon failed to produce before plugging its wells and those which

remained in the ground after Emerald unsuccessfully tried to reenter the wells.

■ When a plaintiff pleads alternate theories of liability, judgment awarding damages on more than one theory may stand if the theories of liability arise from separate and distinct injuries and separate and distinct damage findings are entered on each theory of liability. *See Birchfield,* 747 S.W.2d at 367; *Baribeau v. Gustafson,* 107 S.W.3d 52, 60 (Tex.App.-San Antonio 2003, pet. denied).

Cases holding that a judgment based on both alternate grounds of recovery is an impermissible double recovery involve situations in which there is only one injury, the theories of liability are mutually exclusive, or there are not separate damage findings based on the alternate theories of liability. *Borden, Inc. v. Guerra,* 860 S.W.2d 515, 528–29 (Tex.App.-Corpus Christi 1993, writ dism'd); *see Southern Cty. Mut. v. First Bank & Trust,* 750 S.W.2d 170 (Tex.1988); *Birchfield,* 747 S.W.2d at 367; *Auto Ins. Co. of Hartford v. Davila,* 805 S.W.2d 897, 902 (Tex.App.-Corpus Christi 1991, no writ).

In the instant case, the intervenors' damages were separate and distinct, that is (1) damages for the failure to develop under the leases, and (2) damages for the destruction of the wellbores and the consequent loss of reserves. The theories of breach of contract and waste are not mutually exclusive. We conclude that the jury properly awarded separate and distinct damage awards based on each theory. We overrule this issue.

Having overruled all of Exxon's issues on appeal, the judgment against Exxon and in favor of the intervenors is affirmed.

### III. Intervenors' Appeal

Intervenors request that this Court affirm the trial court's judgment awarding damages for waste and breach of contract; however, if this Court "takes any other action on this appeal," intervenors request that we reverse the trial court's order granting a directed verdict against intervenors and remand for trial intervenors' claims against Exxon for (1) tortious interference with economic opportunity, (2) negligence and gross negligence, (3) negligence per se, (4) fraud and negligent misrepresentation, and (5) breach of regulatory duty.

Because we affirm the trial court's judgment in favor of intervenors, we need not reach these additional issues. *See* Tex. R.App. P. 47.1.

### IV. Emerald's Appeal

Emerald appeals the trial court's granting of a directed verdict on its remaining common-law causes of action. In three issues, Emerald argues that the trial court erred in granting Exxon's motion for a directed verdict on Emerald's causes of action for fraud, negligent misrepresentation, and tortious interference with economic opportunity.

■ A directed verdict is proper when: (1) a defect in the opponent's pleading makes the pleading insufficient to support a judgment; (2) the evidence conclusively proves a fact that establishes a party's right to judgment as a matter of law; or (3) the evidence offered on a cause of action is insufficient to raise an issue of fact. *Encina P'ship v. COREnergy, L.L.C.,* 50 S.W.3d 66, 68 (Tex.App.-Corpus Christi 2001, pet. denied). In reviewing a directed verdict, we examine the evidence in the light most favorable to the party suffering the adverse judgment and we decide whether there is any evidence of probative value to raise an issue of material fact on the question presented. *Bostrom Seating, Inc. v. Crane Carrier Co.,* 140 S.W.3d 681, 684 (Tex.2004).

## A. Fraud

■ To prevail on its claim for fraud, Emerald must prove that: (1) Exxon made a material representation that was false; (2) it knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) it intended to induce Emerald to act upon the representation; and (4) Emerald actually and justifiably relied upon the representation and thereby suffered injury. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.,* 51 S.W.3d 573, 577 (Tex.2001).

■ One who makes a fraudulent misrepresentation is liable to the persons or class of persons whom he intends, or has reason to expect, to act in reliance upon the misrepresentation for pecuniary loss suffered by them through their justifiable reliance, in the type of transaction in which he intends or has reason to expect their conduct to be influenced. *Id.* at 578. Even an obvious risk that a misrepresentation might be repeated to a third party is not enough to satisfy the reason-to-expect standard; rather, the alleged fraudfeasor must have information that would lead a reasonable person to conclude that there is "an especial likelihood that it will reach those persons and will influence their conduct." *Id.* at 580. Further, mere foreseeability will not meet the reason-to-expect standard; instead, the claimant's reliance must be "especially likely" and justifiable, and the transaction sued upon must be of the type contemplated by the defendant. *Id.*

■ Emerald argues that the trial court erred in directing a verdict on its cause of action for fraud because there is evidence that Exxon intended that Emerald rely on Exxon's representations in the public filings with the Railroad Commission. Exxon responds that it could not have intended to induce Emerald to act in reliance on Exxon's filings at the Commission when Emerald did not exist at the time those filings were made. Exxon also argues that evidence that Exxon should have known that remote subsequent operators might rely on representations in its Commission filings does not satisfy the intent requirement for a viable fraud cause of action. Exxon finally argues that there was no evidence that Exxon actually knew that a class of remote subsequent operators might rely on representations contained in Exxon's Commission filings.

We disagree with Exxon's contentions. Examining the evidence at trial in the light most favorable to Emerald, we believe that there is some evidence of probative value sufficient to raise an issue of material fact on Emerald's fraud claim. *Bostrom Seating, Inc.,* 140 S.W.3d at 684. Exxon made material misrepresentations on its W–3 reports regarding many of the wells at issue in this proceeding. There was substantial testimony from the trial witnesses, including Exxon's own witnesses, that Exxon knew subsequent lessees and operators would rely on such filings to make business decisions regarding the wells. Exxon also knew that Emerald's predecessor was interested in leasing the property. We conclude that the foregoing is adequate evidence to satisfy the element of intent. *See Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 435 (Tex.1986) (circumstantial evidence of fraud may also be used to support a finding of fraudulent intent). Emerald leased the property, relying on Exxon's public filings with the Railroad Commission, to its financial detriment. Accordingly we sustain Emerald's first issue.

## B. Negligent Misrepresentation

■ To prevail on a claim for negligent misrepresentation, a plaintiff must demonstrate four elements: (1) the defendant made a representation in the course of his

business or in a transaction in which the defendant has a pecuniary interest; (2) the defendant supplied false information for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffered pecuniary loss by justifiably relying on the defendant's representation. *Fed. Land Bank Ass'n of Tyler v. Sloane,* 825 S.W.2d 439, 442 (Tex. 1991); *Allied Vista, Inc. v. Holt,* 987 S.W.2d 138, 141 (Tex.App.-Houston [14th Dist.] 1999, pet. denied).

■ Exxon argues that the statute of limitations bars Emerald's causes of action for negligent misrepresentation because the evidence conclusively establishes that Emerald knew of its alleged injury more than two years before it filed suit against Exxon. However, we have already determined that the discovery rule applies, and, viewing the evidence in the light most favorable to Emerald, there is probative evidence that Emerald did not discover Exxon's tortious conduct until January 1995 when Lynch received Exxon documents from Quintana Petroleum, Exxon's partner in another lease. Because Emerald filed suit less than two years after receiving these documents, the statute of limitations was not violated.

■ Exxon also contends that there is no evidence that Exxon made the representations in its Form W–3s for the purpose of guiding Emerald in the conduct of its business. Liability under section 552 is limited to those providers of information who (1) intend to supply the information to, or know the recipient of the information

intends to supply the information to, a particular person or limited group, and (2) intends the person or limited group to rely on the information, or knows the person or limited group intends to rely on the information, for a particular or substantially similar transaction. RESTATEMENT (SECOND) OF TORTS § 552(2) (1977); *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests,* 991 S.W.2d 787, 794 (Tex.1999).

■ In the instant case, as previously discussed, it was virtually undisputed that operators routinely and as a matter of course rely on the public filings with the Railroad Commission in making decisions regarding operations. Exxon knew this. Exxon thus supplied information to a limited group and anticipated that it would be relied upon by that group. *Id.* Accordingly, we sustain Emerald's second issue.

### C. Tortious Interference with Economic Opportunity

■ In its third issue, Emerald argues that Exxon was not entitled to a directed verdict on Emerald's cause of action for tortious interference with contract or economic opportunity. In reply, Exxon argues that there is no evidence that it interfered with an existing contract or with Emerald's prospective business or contractual relations. Finally, Exxon argues that Emerald's claims for tortious interference with economic opportunity is barred by the statute of limitations.[10] As an initial matter, we note that we have already resolved the issue of limitations against Exxon and need not further discuss it herein.

---

10. On appeal, Exxon argues that Texas law does not recognize a cause of action for interference with economic opportunity separate and apart from causes of action for tortious interference with an existing contract or with known prospective business or contractual re- lations. Exxon did not raise this issue in its motion for directed verdict and did not reference it in argument to the trial court. Accordingly, we need not consider it here. TEX. R.APP. P. 33.1.

Exxon correctly contends that tortious interference with contract requires an existing contract. The elements of tortious interference with an existing contract are: (1) an existing contract subject to interference; (2) a willful and intentional act of interference with the contract; (3) that proximately caused the plaintiff's injury; and (4) caused actual damages or loss. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex.2000).

As determined by the pleadings, however, Emerald did not contend that Exxon interfered with an existing contract. Emerald's live pleading includes a section entitled "tortious interference with economic opportunity." The text of this section states that Exxon's acts constituted intentional sabotage of the wells and the acts were calculated to cause damage to Emerald or any subsequent lessee who sought to develop or redevelop the field. The text concludes, in part, that Exxon's actions made Emerald's performance under its lease "more burdensome, difficult or impossible or of a less or no value...."

Texas law protects existing as well as prospective contracts from interference. *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 689 (Tex.1989). The tort of interference with contracts embraces all intentional invasions of contractual relations, including any act interfering with the performance of a contract, regardless of whether breach of contract is induced. *Samedan Oil Corp. v. Intrastate Gas Gathering*, 78 S.W.3d 425, 446 (Tex.App.-Tyler 2001, pet. dism'd by agr.); *Tippett v. Hart*, 497 S.W.2d 606, 611 (Tex.Civ.App.-Amarillo 1973, writ ref'd n.r.e.). It follows that where the intentional acts of a person serve to frustrate the purpose of another's contract with a third party, thereby causing damage, such acts constitute the requisite interference. *Samedan Oil Corp.*, 78 S.W.3d at 447; *Hughes v. Houston Nw.*

*Med. Ctr.*, 680 S.W.2d 838, 842 (Tex.App.-Houston [1st Dist.] 1984, writ ref'd n.r.e.). Interference includes any act which retards, makes more difficult, or prevents performance. *Seelbach v. Clubb*, 7 S.W.3d 749, 757 (Tex.App.-Texarkana 1999, pet. denied).

As early as July 1989, Exxon knew that Pace Production Company, a predecessor of Emerald, was interested in leasing the property in question. Exxon's conduct in filing false Form W–3 plugging reports and in effectively sabotaging the wells to prevent or hamper reentry interfered with Emerald's performance under its lease with the intervenors. Emerald sustained costs far in excess of those that would have been reasonable and necessary costs for the redevelopment of the Mary Ellen O'Connor Field. Examining the evidence in the light most favorable to Emerald, we conclude that there is evidence of probative value raising an issue of material fact on the question presented. *Bostrom Seating, Inc.*, 140 S.W.3d at 684. We sustain Emerald's third issue.

Having sustained Emerald's issues, we reverse the trial court's order granting a directed verdict on Emerald's causes of action for fraud, negligent misrepresentation, and tortious interference, and remand those issues for the jury's determination.

## V. Conclusion

The judgment of the trial court is affirmed in part and reversed and remanded in part. Having overruled Exxon's issues on appeal, we affirm the judgment of the trial court in favor of the royalty interest owners. We sustain Emerald's issues on appeal and reverse and remand its causes of action to the trial court.