IN THE SUPREME COURT OF TEXAS








IN THE SUPREME COURT OF TEXAS
 
════════════
No. 05-1076
════════════
 
Exxon Corporation and Exxon 
Texas, Inc., Petitioners,
 
v.
 
Emerald Oil 
& Gas Company, L.C. and Laurie T. Miesch, et al., 
Respondents
 
════════════════════════════════════════════════════
On Petition for Review from 
the
Court of Appeals for the 
Thirteenth District of Texas
════════════════════════════════════════════════════
 
 
Argued February 13, 
2007
            
Justice 
Wainwright 
delivered the opinion of the Court.
            
Justice O’Neill did not participate in the 
decision.
            
In this oil and gas dispute, royalty owners and an oil and gas lessee 
sued a previous lessee for alleged wrongful conduct in the development and 
subsequent abandonment of two oil and gas tracts near Refugio, Texas. The plaintiffs allege statutory and 
common law waste, negligence per se, negligent misrepresentation, tortious interference, breach of lease, and fraud. The trial 
court directed a verdict in favor of the previous lessee on some claims, and the 
remaining claims went to verdict. The jury found in favor of the royalty owners 
and awarded $18.6 million in damages. The court of appeals reversed the directed 
verdict and affirmed the jury verdict. 180 S.W.3d 299. We reverse and 
remand.[1] Today, we also 
issue our opinion in Exxon Corp. v. Emerald Oil & Gas Co., the 
companion to this case. ___ S.W.3d ___ (Tex. 2009).
I. FACTUAL AND PROCEDURAL 
BACKGROUND
            
The royalty owners[2] own several 
thousand acres of land in Refugio, Texas 
(O’Connor Lease). As early as the 1950s, Humble Oil and Refining Company, a 
predecessor of Exxon Corporation and Exxon Texas, Inc. (collectively Exxon), 
began acquiring mineral leases from the royalty owners. Exxon derived its 
interest from four separate mineral leases. The leases included an atypical 
fifty-percent royalty obligation and stringent disclosure, development, and 
surrender clauses.[3] During the 
term of the agreement, Exxon drilled 121 wells and produced at least 15 million 
barrels of oil and more than 65 billion cubic feet of gas, resulting in the 
payment of more than $43 million in royalties.
            
In the early 1970s, Exxon attempted to renegotiate a lower royalty 
because profitability of the operations was declining. As early as 1987, the 
royalty owners requested that Exxon provide them information and documentation 
to support Exxon’s position that the field was depleted and no longer 
profitable, as the royalty owners claimed was required by the Lease to 
discontinue operations. By 1990, the royalty owners knew Exxon intended to plug 
six active wells and demanded that Exxon abandon its plans to plug these wells. 
On August 30, 1990, they sent a letter advising Exxon “that in the event [Exxon] 
plug[s] and abandon[s] any wells which are producing or capable of producing 
minerals in paying quantities to [the royalty owners], Exxon will be sued under 
the terms of the lease and the common law, both for present breach of contract 
and anticipatory damages.”
            
On September 12, 1990, the royalty owners demanded by letter that Exxon 
deliver “any and all information, data and documents pertaining or relating to 
the subject wells, including drilling, production, completion and re-completion 
data, well bore production or completion schematics or diagrams and flow line 
maps and surface facility diagrams or schematics.” In the same letter, the 
royalty owners explained that “plugging and abandonment of the [six] referenced 
wells would commit waste and would be contrary to public policy and laws” and 
that the letter “shall also be considered as [a] formal demand not to plug the 
above referenced six wells.” The royalty owners further informed Exxon that they 
had “located a group of oil and gas companies willing to accept the plugging 
obligation” and assignment of the O’Connor Lease.
            
Initially, Exxon refused to provide any information, claiming that the 
information was proprietary. Later, Exxon claimed the information was too 
difficult to locate and retrieve. Then, Exxon agreed to provide the royalty 
owners a “reading room” containing the requested information subject to a 
confidentiality agreement. The reading room included a large quantity of 
information, but it did not contain any interpretive data or the complete well 
logs. Exxon ultimately concluded that it could no longer profitably afford the 
O’Connor Lease unless the royalty owners agreed to reduce the royalty 
obligation. When negotiations to lower the royalty obligation failed, starting 
in 1989, Exxon began plugging and abandoning the wells. As required by law, 
after Exxon plugged each of the wells, it filed a plugging report with the Texas 
Railroad Commission. 7 Tex. Reg. 3991 (1982) 
(16 Tex. 
Admin. Code § 3.14(b)(1)), amended by 23 Tex. Reg. 9303 (1998) (current version at 16 Tex. Admin. Code § 
3.14(b)(1)).[4] By letter 
dated August 16, 1991, Exxon notified the royalty owners that it had completed 
its plugging operations.
            
In 1993, after Exxon’s lease terminated, the royalty owners entered into 
a lease agreement with Pace West Production, Ltd. (Pace), later known as Emerald 
Oil & Gas Co., L.P. (Emerald)[5], for one-third 
of the acreage in the O’Connor Lease. In deciding whether to lease the land, 
Emerald reviewed Exxon’s public filings related to the field, including the oil 
well plugging reports (W-3 forms) that Exxon filed with the Railroad Commission. 
The filings indicated that Exxon properly plugged the wells. However, Emerald 
encountered problems upon trying to reenter the plugged wells, including wellbores plugged with cut casing[6] and other 
“junk,”[7] wellbores containing environmental contaminants, and plugs 
in locations other than those listed on the reports. Emerald sent the royalty 
owners a written status report on June 8, 1994, explaining that it “encountered 
junk in hole” and that Exxon had cut the casing in some wells. On January 24, 
1995, Emerald met with the royalty owners and explained more about the extent of 
the damage to the wells due to Exxon’s plugging techniques.
            
In January 1995, Emerald obtained Exxon’s internal well records on the 
O’Connor Lease from Quintana, Exxon’s partner on the adjoining tract, also 
leased by Exxon. Exxon’s internal records differed substantially from the 
Railroad Commission filings regarding its plugging of the wells in the O’Connor 
Lease. Concluding that Exxon intentionally sabotaged the field, Emerald sued 
Exxon in July 1996, claiming (1) breach of a duty to plug the wells properly, 
(2) breach of a duty to avoid committing waste, (3) negligence per se in 
violating several sections of the Natural Resources Code and Commission 
Regulations, (4) tortious interference with economic 
opportunity, (5) negligent misrepresentation, and (6) fraud. In August and 
September 1996, the royalty owners intervened and alleged similar claims. In 
October 1999, the royalty owners amended their petitions, adding claims for 
breach of contract for Exxon’s failure to comply with development clauses in the 
lease.
            
Prior to trial, the trial court granted Exxon’s motion for summary 
judgment and severed Emerald’s claims for breach of a duty to plug the wells 
properly, breach of a duty to avoid committing waste, and negligence per se, 
reasoning that Exxon owed no duty to Emerald as a subsequent lessee. Emerald 
appealed the trial court’s summary judgment ruling and severance order. The 
court of appeals reversed and remanded the claims to the trial court. Emerald 
Oil & Gas, L.C. v. Exxon Corp., 228 S.W.3d 166 (Tex. App.—Corpus Christi 
2005), rev’d ____ S.W.3d ____ (Tex. 2009). Exxon 
appealed that judgment to this Court in cause number 05-0729.
            
At trial, Exxon obtained a directed verdict on Emerald’s remaining claims 
and all of the royalty owners’ claims except common law and statutory waste and 
breach of lease. The jury found in favor of the royalty owners on the causes of 
action for waste and breach of lease, awarding $5 million in actual damages for 
waste, $10 million in punitive damages for waste, and $3.6 million in damages 
for breach of lease. The trial court rendered judgment in accordance with the 
verdict. All parties appealed. The court of appeals affirmed the judgment in 
favor of the royalty owners, reversed the directed verdict against Emerald, and 
remanded Emerald’s claims for a new trial. 180 S.W.3d 299. We granted Exxon’s 
petition for review. 
II. LAW AND ANALYSIS
 
A. Statute of Limitations: Statutory 
and Common Law Waste, Negligence Per Se, Negligent Misrepresentation, and Tortious Interference
            
The parties agree that a two-year statute of limitations applies to their 
claims for statutory and common law waste, negligence per se, negligent 
misrepresentation, and tortious interference.[8] Tex. Civ. Prac. & Rem. Code § 16.003(a). However, Emerald and 
the royalty owners argue that Exxon’s conduct tolled the statute of limitations 
or delayed accrual of their claims. At trial, the jury found that the royalty 
owners discovered, or should have discovered in the exercise of reasonable 
diligence, the waste committed by Exxon on January 24, 1995, the date that 
Emerald’s representatives met with the royalty owners and informed them, in the 
words of the court of appeals, “about the full extent of damage to the wells and 
the numerous discrepancies” in Exxon’s plugging reports. 180 S.W.3d at 316. The 
court of appeals determined that the statute of limitations tolled until that 
date and affirmed the judgment on that issue. Id. at 316–17. Exxon argues that 
the court of appeals improperly tolled the two-year statute of limitations until 
Emerald and the royalty owners discovered the full extent of the damage, instead 
of the date Exxon completed plugging the wells.[9] Emerald and 
the royalty owners do not dispute that, unless accrual of the cause of action is 
deferred or the statute of limitations tolled, the two-year statute of 
limitations bars all of their claims except fraud, which has a four-year statute 
of limitations. See Tex. Civ. 
Prac. & Rem. Code § 
16.004.
            
Although Emerald and the royalty 
owners argue that the statute of limitations on their claims has tolled under 
the doctrine of fraudulent concealment, or that the accrual of their claims have 
been deferred because of the discovery rule, we do not reach these issues 
because Emerald and the royalty owners had actual knowledge of violations of the 
lease agreement and their injuries by June 8, 1994 at the latest. Specifically, 
the royalty owners advised Exxon in writing in September 1990 that plugging the 
wells would commit waste in violation of the law. In June 1994, Emerald advised 
the royalty owners that it discovered that Exxon placed cut casing and junk in 
one or more wells. Therefore, by September 1990, the royalty owners had actual 
knowledge of the facts underlying their breach of lease and waste claims, and by 
June 1994, both Emerald and the royalty owners had actual knowledge of the facts 
underlying their negligence and tortious interference 
claims.
            
The royalty owners argue that they did not appreciate the significance of 
the statements in the letter they wrote to Exxon in 1990 and the letter Emerald 
sent to them in 1994. However, the 1990 letter threatened Exxon with a lawsuit 
for waste and violation of the law if it plugged the wells, and in the 1994 
letter, Emerald told the royalty owners that Exxon cut casing and dumped junk in 
the wells that were plugged. Both the court of appeals and the jury concluded 
that Emerald and the royalty owners did not have actual knowledge of their 
claims until January 1995. The legal significance of the undisputed facts cannot 
be ignored. See City of Keller v. Wilson, 168 S.W.3d 802, 814–17 
(Tex. 2005) 
(explaining that courts conducting a no-evidence review cannot ignore evidence 
that has one logical conclusion). The letters unequivocally and conclusively 
establish that the royalty owners and Emerald knew or suspected there was damage 
to their interests in the O’Connor Lease in 1990 and 1994.
            
Causes of action accrue when claimants are on notice of their injury and 
have the opportunity to seek a judicial remedy. Provident Life & Accident 
Ins. Co. v. Knott, 128 S.W.3d 211, 221 (Tex. 2003). The claims have a two-year statute 
of limitations. Irrespective of whether fraudulent concealment or the discovery 
rule tolls any portion of an applicable limitations period, actual knowledge of 
the injury triggers the accrual of the cause of action. The limitations period 
on the royalty owners’ breach of lease and waste claims began to run September 
1990 and ended September 1992, and the limitations period on Emerald’s and the 
royalty owners’ negligence and tortious interference 
claims began to run June 1994 and ended June 1996, when the royalty owners had 
actual knowledge of their claims. Thus, Emerald’s claims brought in July 1996 
and the royalty owners’ claims brought in September 1996 are time-barred. See 
Tex. Civ. Prac. & Rem. 
Code § 16.003(a).
B. Breach of Lease
            
The leases’ development clauses 
require Exxon to “prosecute diligently a continuous drilling and development 
program until [the tracts are] fully developed for oil and gas.” The royalty 
owners claim that Exxon failed to develop two productive zones in violation of 
the development clauses. The court of appeals upheld the jury’s verdict, holding 
that the testimony of the royalty owners’ expert, George Hite, was some evidence 
that the leases were capable of producing in paying quantities until 1999 and 
that Exxon did not drill and complete wells in two productive zones, H12 and 
FS75.[10] 180 S.W.3d at 334–35. Exxon contends no evidence supports the 
jury’s finding that Exxon failed to comply with the development clauses in the 
oil and gas agreement.[11]
            
Before we address Exxon’s legal sufficiency argument, we must first 
determine the scope of Exxon’s development obligations under the leases. “An oil 
and gas lease is a contract, and its terms are interpreted as such.” Tittizer v. Union Gas Corp., 171 S.W.3d 857, 
860 (Tex. 2005); accord Valence Operating 
Co. v. Dorsett, 164 S.W.3d 656, 662 (Tex. 2005) (interpreting an oil and gas 
lease using contract principles). “In construing an unambiguous oil and gas 
lease, . . . we seek to enforce the intention of the parties as it is expressed 
in the lease.” Tittizer, 171 S.W.3d at 860. The 
development clauses state that the tracts are deemed “fully developed” when “at 
least one (1) well has been drilled and completed in each horizon or stratum 
capable of producing [oil or gas] in paying quantities” for a specified number 
of acres. This is a common definition of “fully developed” in an oil and gas 
lease. 5 Howard R. Williams & 
Charles J. Meyers, Oil and Gas Law § 671.4, at 136.1 (3d ed. 2008). The 
parties’ primary dispute is the meaning of “drill” and “complete” in the 
development clause of the lease agreement.
            
The leases do not define “drill” or “complete.” “It is a well recognized 
canon of construction that technical words are to be interpreted as usually 
understood by persons in the profession or business to which they relate, unless 
there is evidence that the words were used in a different sense.” Barrett v. 
Ferrell, 550 S.W.2d 138, 142 (Tex. Civ. App.—Tyler 
1977, writ ref’d n.r.e.). In 
oil and gas parlance, “drill” refers to the “[a]ct of boring a hole through 
which oil and/or gas may be produced if encountered in commercial quantities.” 
8 Howard R. Williams & Charles J. 
Meyers, Oil and Gas Law: Manual of Oil and Gas Terms at 281–82 (3d ed. 
2008). A “completed well” refers to “a well capable of producing oil or 
gas.” Id. at 171 (emphasis added). The 
“completion of a well” can also refer to “those processes necessary before 
production occurs [such as] perforating the casing and washing out the 
drilling mud.” Id. at 174 (emphasis added). 
Certainly, the parties can define the operator’s duty under the contract 
differently. For example,
 
[c]ompensation for drilling an 
oil or gas well may be made contingent upon the discovery of oil or gas in 
paying quantities, but a contract will not be so construed in the absence of a 
clear expression or implication of such intent by the contract . . . . The 
courts in construing contracts for the drilling of wells are not disposed to 
imply warranties as to production.
 
Barrett, 550 S.W.2d 
at 142 (citing W.L. Summers, 
The Law of Oil and Gas § 687 
(perm. ed. 1938)). These definitions show that for a well to be considered 
“drilled and completed” as contemplated by the development clauses, a hole must 
be dug in the ground, and if oil or gas is encountered, the casing must be 
perforated or otherwise prepared for production. The definition of a completed 
well in the treatises is also the one recognized by this Court. Barrett, 
550 S.W.2d at 142 (citing Cannon v. Wingard, 
355 S.W.2d 776, 780 (Tex. Civ. App.—Dallas 1962, writ 
ref’d n.r.e.)). A “well need 
not be a producing well to be completed;” it only needs to be capable of 
producing oil or gas. Id.
            
The royalty owners concede that Exxon complied with the spacing 
requirements and drilled the requisite number of wells per acre. The royalty 
owners, however, confuse Exxon’s contractual obligation to fully develop the 
tract (“drill” and “complete” at least one well), per the terms of the lease, 
with an obligation to exploit the tracts fully. Under the royalty owners’ 
interpretation, Exxon must produce and extract all the reserves in each zone 
capable of production in paying quantities. This obligation appears nowhere in 
the language of the development clauses. Exxon’s development obligations only 
require it to drill a requisite number of wells per acre, and if oil or gas is 
encountered, Exxon must prepare the well for production in paying quantities. In 
the oil patch, mutual incentive of owners and operators to make a profit drives 
the operator, having sunk costs, to produce in paying 
quantities.
            
Having ascertained the scope of Exxon’s development obligations, we now 
turn to the sufficiency of the evidence offered to support the breach of lease 
claim. Because Exxon is attacking the legal sufficiency of the evidence 
supporting an adverse finding on an issue for which it did not have the burden 
of proof, Exxon must show that no evidence supports the jury’s adverse finding. 
See Croucher v. Croucher, 660 S.W.2d 55, 58 (Tex. 1983). Evidence is 
legally sufficient if it “would enable reasonable and fair-minded people to 
reach the verdict under review.” City of Keller, 168 S.W.3d at 827. We “credit 
favorable evidence if reasonable jurors could, and disregard contrary evidence 
unless reasonable jurors could not.” Id. at 827.
            
Exxon argues that Hite’s testimony that Exxon failed to develop the 
leases is conclusory and, therefore, insufficient to 
support the jury’s verdict. “Opinion testimony that is conclusory or speculative is not relevant evidence, because 
it does not tend to make the existence of a material fact ‘more probable or less 
probable.’” Coastal Trans. Co. v. Crown Cent. Petroleum Corp., 136 S.W.3d 
227, 232–33 (Tex. 2004) (quoting Tex. R. 
Evid. 401). Such conclusory evidence cannot 
support a judgment. Id. at 
232.
            
Hite testified that “fully developed” means there are a “sufficient 
number of wells in it to get the reserves.” And when asked whether Exxon 
completed “in the FS75 and the H12, in every well, that Exxon had good 
probability of producing oil and gas in those two zones,” he answered “[n]o, 
they didn’t.” However, when asked whether “drilling the H12 and completing it in 
two wells complete[d] that zone in the wells on this tract that would penetrate 
that zone in paying quantities,” he answered “[i]f 
your question is, did the two wells fully develop the lease, the answer is no.” 
Asked whether the wells Emerald completed in FS75 were “completed in a 
fully-developed manner,” he answered “[n]o, it was not.” The evidence does not 
support his assertion. Hite’s charts of the production from the wells in the 
O’Connor Lease were admitted at trial. The charts show that Exxon drilled at 
least one well in each zone and produced 3,651,850 cubic feet of gas and 78,746 
barrels of oil in zone FS75 and 1,728,728 cubic feet of gas and 3,933 barrels of 
oil in zone H12. The royalty owners concede facts establishing that Exxon 
drilled at least one well in FS75 and at least one well in H12 and both wells 
produced in paying quantities. The attempt to characterize these facts 
differently does not change the evidence.
            
Hite’s subsequent testimony indicates that he too conflated “complete” 
with “produce” or “exploit.” He argues that Exxon violated the development 
clauses because Exxon did not produce more extensively, or exhaust the 
production, from the wells in zones H12 and FS75. His testimony sidesteps the 
precedent question of whether Exxon drilled and completed the requisite number 
of wells per acre and, instead, focuses on whether zones FS75 and H12 would have 
supported further production in paying quantities. He testified that zones H12 
and FS75 had remaining reserve potential and that Exxon had information 
indicating they “could be developed further.” Evidence that further development 
potential existed when Exxon abandoned the leasehold in 1991 is not evidence 
that Exxon failed to comply with the parties’ agreement embodied in the 
development clause. And evidence that Exxon did not fully exploit the reserves 
in FS75 and H12 is not evidence that Exxon did not “drill and complete” the 
requisite number of wells for zones FS75 and H12. The evidence conclusively 
proves that, as required by the contract, Exxon completed at least one well 
capable of producing in paying quantities in each zone. See City of 
Keller, 168 
S.W.3d at 814–15. Therefore, we reverse the court of appeals’ judgment and 
render judgment in favor of Exxon on the breach of lease claim.[12]
C. Fraud
            
Unlike most of Emerald and the royalty owners’ other claims, which have a 
two-year statute of limitations, the statute of limitations for fraud is four 
years. Tex. Civ. Prac. & Rem. 
Code § 16.004(a)(4). The statute 
of limitations for fraud begins to run from the time the party knew of the 
misrepresentation. Little v. Smith, 943 S.W.2d 414, 420 (Tex. 1997). The briefing on this issue does not identify when Emerald 
and the royalty owners learned of the allegedly false plugging reports. Emerald 
does acknowledge that “the first place subsequent operators turn is those very 
filings at the Railroad Commission when deciding whether redevelopment can be 
economically undertaken.” It would seem that the royalty owners learned of the 
asserted misrepresentations in the June 1994 letter from Emerald. The letter 
states that Emerald encountered “junk” in the wells on the O’Connor Lease as 
early as August 1993. Thus, Emerald may have learned about the 
misrepresentations on or around that date. Based on either of these dates, the 
fraud claims filed by Emerald and the royalty owners were timely, and therefore, 
we reach the merits of the fraud claim.[13]
            
The court of appeals reversed the trial court’s directed verdict on the 
fraud claim, holding that the jury should have been allowed to consider whether 
the evidence was sufficient to establish fraud. It asserted that the evidence 
did not conclusively disprove the intent-to-induce reliance element of the fraud 
claim. In reviewing a trial court’s directed verdict, we examine the evidence in 
the light most favorable to the person suffering an adverse judgment and decide 
whether there is any evidence of probative value to raise an issue of material 
fact on the question presented. Henderson v. Travelers Ins. Co., 544 S.W.2d 
649, 650 (Tex. 
1976). We do not hold that public filings, such as Railroad Commission reports, 
alone satisfy the intent-to-induce reliance element of fraud. We conclude there 
was some evidence presented at trial tending to show that Exxon knew, at the 
time it filed the plugging reports, of an especial likelihood that the royalty 
owners and the identified future operators would rely on the inaccurate plugging 
reports. We, therefore, agree with the court of appeals on this 
issue.
            
A plaintiff seeking to prevail on a fraud claim must prove that (1) the 
defendant made a material misrepresentation; (2) the defendant knew the 
representation was false or made the representation recklessly without any 
knowledge of its truth; (3) the defendant made the representation with the 
intent that the other party would act on that representation or intended to 
induce the party’s reliance on the representation; and (4) the plaintiff 
suffered an injury by actively and justifiably relying on that representation. 
See De Santis v. Wackenhut Corp., 793 S.W.2d 670, 688 (Tex. 1990); Trenholm v. 
Ratcliff, 646 S.W.2d 927, 930 (Tex. 1983).
            
Emerald and the royalty owners[14] claim that 
Exxon committed fraud by misrepresenting material information in its plugging 
reports to the Railroad Commission with the intent that known lessees and lessors of such mineral interest would rely on the 
information in the future. The royalty owners and Emerald claim, as a result of 
their reliance, that they are entitled to “the lost wells and minerals, the 
additional cost of re-completing the improperly plugged wells and the increased 
risk in loss of producing zones and wells.” The court of appeals held that 
evidence that Exxon knew that unidentified, subsequent lessees and operators 
might rely on Railroad Commission filings to make business decisions was 
sufficient to satisfy the intent-to-induce reliance element of fraud. 180 S.W.3d 
at 337. Exxon argues that the court of appeals’ decision is erroneous for two 
reasons. First, Exxon argues there is no evidence that future operators would 
rely on the plugging reports because the reports’ only purpose is to allow the 
state to protect against pollution. Second, Exxon argues that Emerald’s approach 
reduces the intent-to-induce reliance element of fraud to mere foreseeability, counter to the Court’s analysis in Ernst 
& Young. 51 S.W.3d 573, 580 (Tex. 2001).
            
“Proper plugging is the responsibility of the operator of the well.” 7 
Tex. Reg. 3991 (1982) (16 Tex. Admin. Code § 
3.14(c)(1)), amended by 23 Tex. Reg. 
9304 (1998) (current version at 16 Tex. Admin. Code § 3.14(c)(1)). The Railroad 
Commission mandates:
 
Non-drillable material that would hamper or prevent 
re-entry of a well shall not be placed in any wellbore 
during plugging operations . . . . Pipe and unretrievable junk shall not be cemented in the hole during 
plugging operations without prior approval by the district 
director.
 
7 Tex. Reg. 3991 (1982) 
(16 Tex. 
Admin. Code § 3.14(c)(9)), amended by 23 Tex. Reg. 9305 (1998) (current version at 16 Tex. Admin. Code § 
3.14(d)(10)). Exxon argues that this section and similar plugging requirements 
are not intended to benefit future operators, but only to protect the 
environment. Thus, Exxon argues, no evidence supports Emerald’s argument that 
there was an especial likelihood that Exxon knew future operators would rely on 
the reports because that is not the reports’ purpose.
            
Although the Railroad Commission explained that it revised section 3.14 
“to protect fresh water in the state from pollution,” the plugging reports are 
not limited to this purpose. The Commission states that one of the objectives of 
the plugging regulations is to prevent plugging of wells that hinder or prevent 
reentering wells, which could be desired by the same or subsequent owners or 
operators. 7 Tex. Reg. at 3989. To police this 
regulation, the Commission requires that the plugging reports, or W-3s, be 
verified under oath, be filed within thirty days after the plugging is 
completed, and disclose the methods used to plug a well. Id. at 3991. Thus, 
the purpose of requiring operators to file plugging reports with the Commission 
is to ensure that operators follow a plugging procedure that not only prevents 
pollution, but also allows reentry into the wells for commercial 
purposes.
            
However, the mere fact that royalty owners and subsequent lessees might 
or should rely on statements in Exxon’s plugging reports alone is not sufficient 
to establish an intent to induce reliance, as the court of appeals and Emerald 
argue. Ernst & Young, 51 S.W.3d at 580. In Ernst & Young, 
we considered the proof necessary to establish the intent-to-induce reliance 
element of a fraud claim. Although we declined to decide whether to adopt the 
reason-to-expect standard outlined in section 531 of the Restatement (Second) of 
Torts, we concluded that this standard is consistent with Texas fraud 
jurisprudence. Id. Section 531 provides:
 
One who makes a fraudulent misrepresentation is subject to 
liability to the persons or class of persons whom he intends or has reason to 
expect to act or to refrain from action in reliance upon the misrepresentation 
for pecuniary loss suffered by them through their justifiable reliance in the 
type of transaction in which he intends or has reason to expect their conduct to 
be influenced.
 
Restatement (Second) of 
Torts § 531 (1977). Like the defendants in 
Ernst & Young, Exxon argues that this approach reduces the 
intent-to-induce element to a foreseeability standard. 
We rejected that argument in Ernst & Young, holding that section 
531’s “reason-to-expect standard requires more than mere foreseeability; the claimant’s reliance must be ‘especially 
likely’ and justifiable, and the transaction sued upon must be the type the 
defendant contemplated.” Ernst & Young, 51 S.W.3d at 580. Evidence 
that reliance on false public information as part of a general industry practice 
is insufficient, as a matter of law, to prove an intent to induce reliance. 
Id. at 
581–82. Even an obvious risk that a misrepresentation might be repeated to a 
third party is not sufficient to satisfy the reason-to-expect standard. A 
plaintiff must show that “[t]he maker of the misrepresentation [has] information 
that would lead a reasonable man to conclude that there is an especial 
likelihood that it will reach those persons and will influence their conduct.” 
Id. 
at 581 (citing Restatement (Second) 
of Torts § 531 (1977)). The standard is not met if a plaintiff merely 
foresees that some party may rely on statements made in a public filing. In 
order to prove intent-to-induce reliance under this standard, the party must 
show an especial likelihood that the party who made the misstatement knew the 
claimant would rely on the information in the type of transaction the defendant 
contemplated. See Ernst & Young, 51 S.W.3d at 
580.
            
Therefore, if the evidence shows that Exxon made material 
misrepresentations in its plugging reports to the Railroad Commission, and Exxon 
knew that lessors and operators in the future may rely 
on the filings, such evidence would fail as a matter of law under the Ernst 
& Young standard. Id. at 581–82. Such a holding would 
open the cause of action to any person who subsequently relied on any public 
filings—including stocks and bonds, security interests, real property deeds, and 
tax filings—with few limits in sight. The intent-to-induce reliance element of 
fraud is a focused inquiry, more akin to a rifle shot than a shotgun blast. 
Intent-to-induce reliance is not satisfied by evidence that a misrepresentation 
may be read in the future by some unknown member of the public or of a specific 
industry.
            
Here, however, there is some evidence that Exxon knew of an especial 
likelihood that Emerald specifically would rely on the plugging reports in a 
transaction being considered at the time it filed the plugging reports. In 1989, 
Exxon concluded that it could no longer profitably operate the leases unless 
Exxon’s royalty could be renegotiated. The negotiations failed, and Exxon 
plugged the wells in the O’Connor Lease between 1989 until 1991. In their letter 
of September 12, 1990, the royalty owners stated, “[W]e have located a group of 
oil and gas companies that are willing to accept the plugging obligations and an 
Assignment of the above referenced [six] wells [and certain acreage around each 
well].” They also offered their consent to assign all of Exxon’s right, title, 
and interest in the leases to several companies and indicated their interest in 
future oil and gas operations in the Lease.
            
In 1989, Emerald expressed that it was “most anxious to proceed” with 
production in the O’Connor Lease and offered to purchase Exxon’s interest. 
Emerald renewed its offer in January 1990. By letter of July 23, 1990, Exxon 
advised each of the royalty owners that Pace had expressed an interest in the 
Lease. On May 25, 1993, Emerald acquired the interest to develop the 
Lease.
            
Exxon knew the royalty owners had a continuing interest in further 
developing the O’Connor Lease, received offers from the putative subsequent 
lessee to purchase Exxon’s interest in the Lease, and knew the transaction 
proposed by Miesch and Emerald was the continued 
production of oil and gas in the Lease. Thus, legally sufficient evidence in the 
record supports the claim that Exxon had information that would lead a 
reasonable person to conclude there was an especial likelihood these plaintiffs 
would rely on Exxon’s inaccurate filings with the Railroad Commission at the 
time it filed them. Accordingly, the trial court’s grant of directed verdict on 
the fraud claim on this basis was in error.[15]
III. CONCLUSION
            
We hold the statutory and common 
law waste, negligence per se, negligent misrepresentation, and tortious interference claims are time-barred and reverse and 
render judgment in Exxon’s favor with respect to those claims. We also hold no 
evidence supports the breach of lease claims and reverse and render judgment in 
Exxon’s favor with respect to those claims. Finally, we affirm the court of 
appeals’ judgment, for different reasons, reversing the trial court’s directed 
verdict with respect to the fraud claim, and remand that claim to the trial 
court for further proceedings.
 
 
________________________________________
                                                                                                                
 Dale Wainwright
                                                            
 Justice
 
OPINION DELIVERED: March 27, 2009
                
 








[1] 
We received amicus briefs from the Texas Oil & Gas Association, The Texas 
Alliance of Energy Producers, the Texas Land and Mineral Owners’ Association, 
Texas and Southwestern Cattle Raisers Association, and Jerry Patterson, 
Commissioner of the Texas General Land Office and Chairman of the School Land 
Board.

[2]
The royalty 
owners (collectively referred to as Miesch) are Molly 
Miesch Allen, Brien O’Connor 
Dunn, Bridey Kathleen Dunn Greeson (individually and as trustee of Dunn-O’Connor Family 
Trust), Jack Miesch, Laurie T. Miesch, Michael Miesch, Morgan 
Frances Dunn O’Connor, Nancy O’Connor, T. Michael O’Connor, Janie Miesch Robertson, 
and Kelly Patricia Dunn Schaar.

[3] 
The four leases are not identical; however, the differences are not material to 
the analysis in this case.

[4]
Title 16 
section 3.14 of the Texas Administrative Code requires well operators to file 
plugging reports, or W-3 forms, with the Railroad Commission within thirty days 
after each well is plugged. 16 Tex. Admin. Code § 3.14. Section 3.14 mandates 
that an operator disclose the specific methods used to plug the wells and sign 
an oath verifying that the statements in the report are true. Id.

[5] 
The evidence indicates that Emerald was formerly known as Pace West Production, 
Ltd. A May 25, 1993 “Agreement for Waivers” between Emerald and the royalty 
owners states that Emerald was “formerly known as Pace West Production, L.C., 
and also formerly known as Pace West Production, Ltd.” An undated “Memorandum of 
Amended Oil and Gas Lease and Financing Statement” also states that Emerald was 
formerly known as Pace West. Additionally, Glenn Warren Lynch, a representative 
from Emerald, testified that Emerald “was formerly known as Pace West.” T. 
Michael O’Connor, one of the royalty owners, explained that Emerald was 
operating under another name, Pace West, when it made an initial offer to reopen 
some of the wells in the O’Connor Lease.

[6] 
Exxon does not dispute that it plugged the wells using non-standard plugging 
procedures. It admits to cutting the well casing and leaving it in the wellbore. This material may delay completion of the well and 
increase reentry expenses. Tarrant County Water Control & Imp. Dist. No. One v. 
Fullwood, 963 S.W.2d 60, 67 (Tex. 1998).

[7] 
The term “junk” is a term of art used in the oil and gas industry to refer to 
“non-drillable material such as steel or iron, in [a] well bore.” Id.

[8] 
This discussion pertains only to the royalty owners’ claims for statutory and 
common law waste and negligence per se. Emerald’s similar claims were severed at 
the trial court and are the subject of the opinion issued in the companion case, 
Exxon v. Emerald Oil & Gas Co., L.C. ___ S.W.3d ___ (Tex. 
2009).

[9] 
Emerald argues that Exxon failed to preserve its argument that the tortious interference claims are time-barred. In its motion 
for directed verdict at trial, Exxon stated that “all of the claims asserted by 
the Plaintiffs . . . are barred by the applicable statutes of limitations.” 
Exxon made the same argument before the court of appeals and raises the issue in 
this Court. Exxon preserved this issue for our review.     
 

[10] The royalty owners and their expert (Hite) 
used “horizon,” “stratum,” and “zone” interchangeably.

[11] The jury also found that Exxon fraudulently 
concealed its breach and that the royalty owners did not know, and could not 
have known with due diligence, that Exxon fraudulently concealed its failure to 
fully develop until February 1999 when Exxon produced previously requested 
documents during discovery. For the reasons that follow, we need not reach the 
royalty owners’ fraudulent concealment claim.

[12] Because we conclude no evidence supports 
the royalty owners’ underlying breach of lease claim, we need not reach the 
issue of whether the claim is time-barred or whether the doctrine of fraudulent 
concealment tolls the statute of limitations. See Moreno v. Sterling Drug, 
Inc., 787 S.W.2d 348, 352 n.1 (Tex. 1990) (holding that the doctrine of 
fraudulent concealment estops a defendant who conceals 
the existence of a cause of action from asserting the statute of limitations as 
an affirmative defense).

[13] Nothing in this opinion precludes Exxon 
from claiming on remand that Emerald and the royalty owners learned of 
misrepresentations earlier.

[14] Because the royalty owners only 
conditionally challenged the directed verdict at the court of appeals, and the 
court of appeals upheld the judgment in their favor, the royalty owners do not 
address the fraud claim in detail before this Court.

[15] Emerald and the royalty owners claim that 
they are entitled to all of their damages, including lost wells and minerals, 
due to the alleged fraud. Because this issue was not presented to this Court, we 
need not address it in this opinion. However, we note that the “measure of 
damages in a fraud case is the actual amount of the plaintiff’s loss that 
directly and proximately results from the defendant’s fraudulent conduct.” 
Tilton v. Marshall, 925 S.W.2d 672, 680 
(Tex. 
1996).